Filed 11/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DEPARTMENT OF HEALTH CARE SERVICES, <br><br> Petitioner and Appellant, <br><br> v. <br><br> OFFICE OF ADMINISTRATIVE HEARINGS, <br><br> Respondent; <br><br> PARENTS ON BEHALF OF STUDENT, et al., <br><br> Real Parties in Interest. | F071023 <br><br> (Super. Ct. No. CV58418) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kate Powell Segerstrom, Judge.

Kamala D. Harris, Attorney General, Julie-Weng Gutierrez, Assistant Attorney General, Ismael A. Castro, Supervising Attorney General, Ashante L. Norton and Renu R. George, Deputy Attorneys General, for Petitioner and Appellant.

Orry P. Korb, County Counsel (Santa Clara), Danny Y. Chou, Greta S. Hansen, and Jenny S. Lam, Deputy County Counsel; Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Petitioner and Appellant.

No appearance for Respondent.

Ruderman & Knox, Frank Richard Ruderman, Daniel R. Shaw and Colleen A. Snyder for Real Party in Interest Parents on Behalf of Student.

Lozano Smith, Sloan R. Simmons, Marcella L. Gutierrez and Nicholas W. Smith for Real Parties in Interest Tuolumne County Office of Education and Sonora Elementary School District.

Dannis Woliver Kelley, Sue Ann Salmon Evans, Amy R. Levine and Steven Wong; Keith J. Bray and Joshua R. Daniels for California School Board Association/Education Legal Alliance as Amicus Curiae on behalf of Real Parties in Interest Tuolumne County Office of Education and Sonora Elementary School District.

-ooOoo-

The Department of Health Care Services (Department) filed a petition for writs of administrative and traditional mandamus, and declaratory relief, seeking, among other things, an order compelling the Director of the Department of General Services, Office of Administrative Hearings, Special Education Division (OAH) to set aside the order and decision issued by one of its administrative law judges in the matter of *Parents on Behalf of Student v. Tuolumne County California Children's Services*, OAH Case No. 2012100238. The Sonora Elementary School District (District) and the Tuolumne County Office of Education (County) (collectively the Educational Agencies), as well as the student's parents (Parents), all of whom the Department named as real parties in interest, joined in the opposition to the Department's petition. The trial court denied all of the Department's requests, thereby affirming the administrative law judge's order and decision, and ordered the Department to pay the student's reasonable attorney fees and costs associated with both the instant and underlying cases.

On appeal, the Department contends the trial court erred when it: (1) summarily denied the petition for writ of administrative mandamus; (2) failed to conduct an independent review on the petition for writs of administrative and traditional mandamus; (3) found that the OAH had jurisdiction over Parents' claims against the Department;

2.

(4) failed to find the administrative law judge acted contrary to law in the remedies he ordered; (5) denied its request for declaratory relief; and (6) awarded attorney fees. While we agree with the Department's first two contentions and conduct our own independent review of its mandamus claims, we conclude that the trial court did not err in denying the requests for writs of mandamus and declaratory relief, and awarding attorney fees to the student. Accordingly, we affirm the judgment.

### BACKGROUND

I.      Legal Background

The State of California receives funds under the federal Individuals with Disabilities Education Act, 20 United States Code § 1400 et seq. (IDEA). As a result, it must comply with the act's requirements. (See 20 U.S.C. § 1412(a).) In order to do so, California adopted legislation contained in both the Education and Government Codes, as well as implementing regulations. (See Ed. Code, § 56000 et seq.; Gov. Code, § 7570, et seq.;[1] Cal. Code Regs., tit. 5, § 3000 et seq.; Cal. Code Regs., tit. 2, § 60000 et seq.)

Under the IDEA and state law, children with disabilities have the right to a "free appropriate public education" (FAPE). (20 U.S.C. § 1400(d); Ed. Code, § 56000.)[2] A FAPE consists of "special education and related services" that are provided to the child at no charge to the parent or guardian, meet state educational standards, and conform to the child's individualized education program (IEP). (20 U.S.C. §§ 1401(9) & (14), 1412(a)(4), 1414(d).) "Special education" is instruction specially designed to meet the child's unique needs. (20 U.S.C. § 1401(29).) "Related services[,]" called designated instruction and services in California, include "developmental, corrective and other

---

[1] Undesignated statutory references are to the Government Code.

[2] The IDEA evolved from the Education for All Handicapped Children Act, Pub.L. No. 94-142, 89 Stat. 773 (1975) (EHA), which Congress passed in 1975. (*C.O. v. Portland Public Schools* (9th Cir. 2012) 679 F.3d 1162, 1164.) California elected to participate in the EHA and adopted its procedural safeguards in 1980. (Ed. Code, §§ 56500 et seq.; *White v. State of California* (1987) 195 Cal.App.3d 452, 461.)

supportive services[,]" such as physical therapy (PT) and occupational therapy (OT), "as may be required to assist a child with a disability to benefit from special education." (20 U.S.C. § 1401(26)(A); Ed. Code, § 56363.)

The provision of a FAPE begins with the development of an IEP, which is a written statement that contains an educational program tailored to the unique needs of a child with a disability. (20 U.S.C. §§ 1401(14), 1412(a)(4), 1414(d).) The IEP includes, among other things, a "statement of special education and related services and supplementary aids and services . . . to be provided to the child, or on behalf of the child, . . . " (20 U.S.C. §§ 1412(a)(4), 1414(d)(1)(A)(IV).) An IEP team, consisting of parents, teachers and school district representatives, participates in the development of the IEP. (20 U.S.C. § 1414(d).)

In California, the related services of OT and PT may be provided to a child with a disability by the local education agency[3] or the Department through the California Children's Services Program (CCS), which is a state and county program that the Department administers.[4] (Health & Saf. Code, §§ 123805, 123845, 123850.) CCS provides medically necessary benefits to persons under 21 years of age who have physically disabling conditions and meet its medical, financial and residential eligibility

---

[3] A local education agency (LEA) is "a school district or county office of education which provides special education and related services." (Cal. Code Regs., tit. 2, § 60010, subd. (k).)

[4] CCS is established through the Robert W. Crown California Children's Services Act, Health and Safety Code section 123800 et seq. (the Crown Act), by which the Legislature intended to provide for "necessary medical services required by physically handicapped children whose parents are unable to pay for these services[,] and to "include the necessary services rendered by the program to physically handicapped children treated in public schools that provide services for physically handicapped children." (Health & Saf. Code, § 123825.) CCS generally is administered locally by each county's department of public health or department of social welfare. (Health & Saf. Code, § 123850.) We apply the term "CCS" interchangeably to both California Children's Services and its local county designee, Tuolumne County California Children's Services.

4.

requirements. (Health & Saf. Code, §§ 123805, 123825, 123840, 123870, 123875, 123895.) CCS's Medical Therapy Program (MTP) provides PT, OT and physician consultations to eligible students in schools. (Health & Saf. Code, § 123950; Cal. Code Regs., tit. 2, § 60323.)[5] Pursuant to state law, CCS provides "medically necessary" OT and PT to special education students "by reason of medical diagnosis and when contained in the child's [IEP][,]" (§ 7575, subd. (a)(1)), while the [LEA] provides "related services" that CCS does not deem to be medically necessary, but which the IEP team determines are needed "to assist a child to benefit from special education." (§ 7575, subd. (a)(2).)

Parents play a significant role in the IEP process. The team must consider their concerns for enhancing their child's education. (20 U.S.C. § 1414(d)(3)(A)(ii).) "IDEA accords parents additional protections that apply throughout the IEP process. See, *e.g.*, [20 U.S.C.] § 1414(d)(4)(A) (requiring the IEP Team to revise the IEP when appropriate to address certain information provided by the parents); [20 U.S.C.] § 1414(e) (requiring States to 'ensure that the parents of [a child with a disability] are members of any group that makes decisions on the educational placement of their child'). The statute also sets up general procedural safeguards that protect the informed involvement of parents in the development of an education for their child. See, *e.g.*, [20 U.S.C.] § 1415(a) (requiring States to 'establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]'); [20 U.S.C.] § 1415(b)(1) (mandating that States provide an opportunity for parents to examine all relevant records). See generally [20 U.S.C.] §§ 1414, 1415. A central purpose of the parental protections is to facilitate the provision of a ' "[FAPE]," ' [20 U.S.C.] § 1401(9), which must be made available to the child 'in conformity with the

---

[5] Further references to the California Code of Regulations will be to the relevant title and provision number.

5.

[IEP],' [20 U.S.C.] § 1401(9)(D)." (*Winkelman ex rel. Winkelman v. Parma City School Dist.* (2007) 550 U.S. 516, 524 (*Winkelman*).)

"When a party objects to the adequacy of the education provided, the construction of the IEP, or some related matter, IDEA provides procedural recourse: It requires that a State provide "[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child.' [20 U.S.C.] § 1415(b)(6). By presenting a complaint a party is able to pursue a process of review that, as relevant, begins with a preliminary meeting 'where the parents of the child discuss their complaint' and the [LEA] 'is provided the opportunity to [reach a resolution].' [20 U.S.C.] § 1415(f)(1)(B)(i)(IV). If the agency 'has not resolved the complaint to the satisfaction of the parents within 30 days,' [20 U.S.C.] § 1415(f)(1)(B)(ii), the parents may request an 'impartial due process hearing' [20 U.S.C.] § 1415(f)(1)(A), which must be conducted either by the [LEA] or by the state educational agency, *ibid.*, and where a hearing officer will resolve issues raised in the complaint, [20 U.S.C.] § 1415(f)(3)." (*Winkelman*, *supra*, 550 U.S. at p. 525.) In California, a due process hearing is an administrative proceeding conducted by the OAH. (See Educ. Code, § 56504.5; § 27727.) This case arises out of the Department's challenge to the outcome of a due process hearing.

II.     Factual Background

L.M., who was five years old at the time of the administrative hearing, was eligible for special education services due to multiple disabilities, specifically orthopedic and visual impairment. She has a medical diagnosis of cerebral palsy, is hypotonic, has extremely low muscle tone, and lacks isolated control over individual muscles. She must be positioned for most activities as she is unable to sit or stand on her own, and is dependent for all care and mobility. L.M. has deficits in the areas of fine, gross and oral motor functioning.

At all relevant times, L.M. qualified for both special education services from the District and medically-based OT and PT services from Tuolumne County CCS, which were included in her IEPs for the 2011-2012 and 2012-2013 school years as related services.

Dr. Robert Haining,[6] a consultant physician for CCS, first prescribed OT and PT for L.M. in April 2010.  The prescription was for six months and provided for 30-minute sessions of direct therapy twice a week, whereby the therapist provided direct therapeutic treatment to L.M.  The therapist also provided instruction to Parents and modeled activities for them to do with L.M. at home.  Parents consented to these services.  CCS reviewed L.M.'s services in July 2010 and May 2011; the prescription remained the same.  The May 2011 prescription was for a six-month period, which ended on November 16, 2011.

An IEP team meeting was held on June 3, 2011 to develop the IEP for the 2011-2012 school year (the June 2011 IEP).  The June 2011 IEP listed as related services CCS medically necessary direct OT and PT twice a week for 30 minutes per session.  Although CCS's prescription for services ended in November 2011, the IEP set the dates for services from June 3, 2011 through June 16, 2012.  Parents consented to the June 2011 IEP with the exception of the District's educational placement offer.

In November 2011, CCS evaluated L.M.'s condition, as the six-month prescription was due to expire.  L.M.'s gross motor skills had not improved.  On November 28, 2011, Dr. Haining wrote a new one-year prescription which reduced L.M.'s CCS services to monitoring sessions twice a month for 30 minutes per session.[7]  Under the monitoring

---

[6] Dr. Haining is a pediatrician who specializes in pediatric rehabilitation.  He is board certified in physical medicine and rehabilitation, pediatrics and pediatric rehabilitation, and has approximately 30 years of experience in his field.

[7] "Monitoring" is "a regularly scheduled therapy activity in which the therapist reevaluates the pupil's physical status, reviews those activities in the therapy plan which

7.

program, the therapist used the two monthly visits to check on L.M.'s progress in the home program, and provide help to Parents.  CCS timely notified Parents and the Educational Agencies of the new prescription for services.  No IEP team meeting was convened to discuss the changes, which CCS immediately and unilaterally implemented although it knew they differed from the services listed in L.M.'s IEP.  Parents did not consent to the reduction and change in services.  In May 2012, L.M.'s CCS occupational therapist retired and CCS ceased providing any OT to L.M. until approximately January 2013.

On August 23, 2012, the District convened L.M.'s annual IEP team meeting.  During the meeting, L.M.'s physical therapist, Margaret Grolle, who was on contract with CCS and represented CCS at the meeting, discussed CCS's therapy plan and recommended services, which were consistent with the reduced services set out in the November 2011 therapy plan.  Parents consented to the August 2012 IEP except for CCS's reduction in services.  Because Parents disagreed with the decision to reduce L.M.'s CCS services, CCS provided them with a copy of the "CCS Medical Therapy Program Dispute Resolution Process[,]" which sets out the procedure for Parents to appeal CCS's decision pursuant to title 22 of the California Code of Regulations.  Parents, however, did not want to go through the dispute resolution process.  Instead, they offered to set up an IEP meeting with the District, as they believed the disagreement over CCS's services should be discussed with the entire IEP team.  CCS declined the invitation to participate in an IEP team meeting.

In September 2012, Parents had L.M. privately assessed by physical therapist Dr. Kristine N. Corn.[8]  Dr. Corn believed L.M. had far more potential than her current

---

are provided by parents, care givers or LEA staff, and updates the therapy plan as necessary."  (Tit. 2, § 60300, subd. (k)(3).)

[8] Dr. Corn is a licensed physical therapist who holds a Bachelor of Science, Masters, and Ph.D. in PT.  Dr. Corn has been a physical therapist since 1965.  She

therapists and doctors had determined, and she needed an opportunity to increase postural tone and strength through PT. In Dr. Corn's experience, sometimes a different approach to therapy was required. Dr. Corn recommended that L.M. receive PT a minimum of two hours per week.

On September 24, 2012, a medical therapy conference was held.[9] Dr. Haining's PT prescription and therapy plan further reduced L.M.'s medically necessary PT to monitoring services of once per month for six months. With respect to medically necessary OT, Dr. Haining issued a prescription for an occupational therapist to assess L.M. and carry out any recommended treatment. Parents provided Dr. Haining with Dr. Corn's independent evaluation, but he only gave the report a cursory review and disregarded its recommendations in part because Dr. Corn was not a medical doctor or a paneled CCS doctor. Parents did not consent to the change in services. Again, CCS immediately and unilaterally implemented the changes in L.M.'s CCS services without any changes being sought or made to L.M.'s IEP. The District did not convene an IEP team meeting and CCS did not ask for one.

In November 2012, Parents obtained an independent OT assessment by occupational therapist Catherine Leavitt.[10] Leavitt recommended that L.M. receive two hours of direct OT per month.

---

specializes in children with neurodevelopmental delays, including children with cerebral palsy. She has been a CCS-paneled physical therapist and provided therapy to children referred by various CCS agencies.

[9] A medical therapy conference is "a team meeting held in the medical therapy unit where medical case management for the pupil's medical therapy program eligible condition is provided by the medical therapy conference team . . .". (Tit. 2, § 60300, subd. (h).) A medical therapy conference team is composed of the pupil, parent, physician and occupational or physical therapist, or both. With the consent of the pupil's parents, the team may include an education representative who is present for the purpose of coordination with medical services. (Tit. 2, § 60300, subd. (i).)

[10] Leavitt is a registered occupational therapist who practiced for approximately 30 years before her retirement. She has a Masters of Science degree in OT. Leavitt has

On March 11, 2013, another IEP team meeting was convened for L.M. Both Grolle and Kathleen Amos, the public health nursing director for Tuolumne County and CCS administrator, attended the meeting on CCS's behalf. CCS informed the team it had reduced L.M.'s PT services on September 24, 2012, to once a month monitoring. L.M. had been assessed for medically necessary OT on CCS's behalf; 12 one-hour OT sessions were recommended. Parents continued to disagree with CCS's offer of services, which the IEP team discussed. Parents presented both Dr. Corn's and Leavitt's independent assessments to the IEP team, and Dr. Corn participated via teleconference, but CCS ignored the assessments and failed to consider them.

II. Procedural Background

A. The Due Process Hearing and Decision

L.M. filed a special education due process complaint against CCS on October 3, 2012. L.M. alleged that CCS denied her a FAPE during the 2011-2012 and 2012-2013 school years by: (1) failing to provide her with adequate PT and OT; (2) unilaterally reducing her PT and OT outside the IEP team process; and (3) failing to implement services required by her IEPs. She also alleged that CCS procedurally denied her a FAPE during the same school years by: (1) failing to comply with the requirements of the IDEA; (2) failing to actively participate in the IEP team process; (3) unilaterally making decisions outside the IEP team process; and (4) failing to consider independent evaluations.

In November 2012, CCS moved to dismiss the case on the grounds that the OAH lacked jurisdiction over Parents' due process complaint. Alternatively, CCS moved for an order to either limit the claims asserted against it or to join the Educational Agencies as parties. CCS argued the matter should be dismissed because: (1) CCS is not the public

worked in multiple settings, and has assessed 75 to 100 children. She has been a CCS paneled occupational therapist.

education agency responsible for providing a FAPE; (2) CCS is statutorily responsible for providing only "medically necessary" OT and PT, and any additional services that are educationally necessary to provide a FAPE are the LEA's responsibility; and (3) the OAH did not have jurisdiction to adjudicate L.M.'s claims against CCS because L.M. was required to seek resolution of her claims through the exclusive dispute resolution procedure set forth in title 22, section 42140, subdivision (a).

On December 4, 2012, the OAH denied the motion to dismiss, but ordered the Educational Agencies to be joined in the action. L.M., however, subsequently entered into a settlement agreement with the Educational Agencies, who then were dismissed from the matter. In exchange for a waiver of Parents' claims and the resolution of all disputes related to the Educational Agencies' provision of a FAPE and services to L.M., the Educational Agencies agreed to conduct an educationally-based OT assessment and implement the assessor's recommendations, and contract with a nonpublic agency to provide educationally-based PT for two hours each week.

Presiding Administrative Law Judge (ALJ) Bob N. Varma conducted the due process hearing on May 7, 8 and 9, 2013. After the conclusion of the presentation of evidence and witnesses, the parties submitted written closing briefs. On July 15, 2013, the ALJ issued a written decision on whether CCS committed procedural violations that resulted in the denial of a FAPE to L.M. during the 2011-2012 and 2012-2013 school years.

First, the ALJ addressed CCS's challenge to the OAH's jurisdiction. It rejected CCS's claims that it could unilaterally change CCS services that are part of a child's IEP without further regard to the IEP development process and that any appeal of its decisions, even for children whose IEPs include CCS services, must be pursued through the process set forth in Title 22. Instead, the ALJ found that, while CCS has the sole authority to determine if a child is eligible for medically necessary OT and PT, once that determination is made and the IEP team places those services in the child's IEP, the child

11.

or parents have the right to challenge any changes to those services that CCS thereafter recommends in a due process hearing.

With respect to L.M.'s procedural challenges, the ALJ found that while CCS participated in the development of L.M.'s IEPs to the extent required, it denied L.M. a FAPE by unilaterally reducing her medically necessary OT and PT in November 2011 and September 2012, and failing to review Dr. Corn's and Leavitt's assessments in March 2013. With respect to CCS's unilateral reduction of services, the ALJ determined: "CCS is required to utilize the IEP development process to obtain parental consent to any changes in [L.M.]'s related OT and PT services that it recommends; or to use the due process hearing procedures to obtain an order from the OAH to override parental denial of consent to changes in [L.M.]'s services." Because the ALJ found that CCS failed to comply with the IDEA's procedural requirements, the ALJ did not make any findings as to whether CCS denied L.M. a FAPE by failing to provide adequate OT and PT.

As remedies for CCS's procedural violations of the IDEA, the ALJ ordered CCS to: (1) provide L.M. with 40 hours of direct compensatory OT and 50 hours of direct compensatory PT; (2) reinstate L.M.'s CCS services to the levels contained in the last agreed IEP of June 2011; (3) review the independent assessments, meet with Parents and the appropriate IEP team members, and cooperate with scheduling an IEP team meeting to review all reports, with CCS's recommendations becoming the District's recommendations to the extent the IEP team adopted them as medically necessary; and (4) provide training to its staff. The ALJ named L.M. as the prevailing party on two issues and the partially prevailing party on the third issue.

B. This Lawsuit

On October 10, 2013, the Department filed a petition for writ of mandate and complaint for declaratory relief in superior court against the Director of the OAH, with

12.

Parents and the Educational Agencies named as real parties in interest.[11] The Department alleged three causes of action. First, it sought a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5 to set aside the OAH's decision based on allegations that the OAH exceeded its jurisdiction, abused its discretion, and failed to proceed in a manner required by law when it: (1) ordered the Department and CCS to provide services CCS had not determined were "medically necessary"; (2) found CCS denied L.M. a FAPE; (3) ordered the Department to provide compensatory OT and PT without a doctor's prescription, in violation of the law, and prescribed medical treatment in violation of the Business and Professions Code and CCS regulations; and (4) failed to apply and enforce California law.

Next, the Department sought a writ of ordinary mandamus pursuant to Code of Civil Procedure section 1085. The Department alleged that the OAH had a clear, present and ministerial duty to issue decisions that comply with the statutory requirements for CCS services and do not require the Department to act contrary to them, and that by failing to correctly apply the law, the OAH denied the Department rights secured by law.

Finally, in its claim for declaratory relief, the Department alleged an actual controversy existed between the parties regarding their respective rights and duties, and requested a determination that the OAH's decision was inconsistent with the law's requirements.[12]

In April 2014, the Educational Agencies moved for judgment on the pleadings on the following grounds: (1) the superior court did not have jurisdiction over them due to the Department's failure to exhaust its administrative remedies, as it did not initiate an

[11] In November 2013, Parents removed the action to the United States District Court for the Eastern District of California. In March 2014, the federal court granted the Department's motion to remand and remanded the case to Tuolumne County Superior Court.

[12] In March 2014, Parents filed a cross-complaint against the Department in which they sought to enforce the OAH decision and requested an award of attorney fees.

interagency dispute under section 7585, subdivision (a); and (2) the Department failed to allege any cause of action against them. The trial court denied the motion, finding that the Department exhausted its administrative remedies and had alleged a cause of action against the Educational Agencies.

Pursuant to a briefing schedule, the Department submitted a memorandum of points and authorities in support of its petition. Without distinguishing between its claims for administrative and ordinary mandamus, the Department argued the following: (1) the OAH did not have jurisdiction to hear Parents' claims as to CCS because they failed to exhaust their administrative remedies under Title 22, section 42140; (2) the ALJ abused his discretion in denying CCS's motion to dismiss, as CCS is not a proper party to a due process complaint, and erred when he allowed the matter to proceed against CCS alone, without the Educational Agencies as parties; (3) the ALJ erred in returning L.M.'s CCS services to the level stated in her June 2011 IEP and ordering compensatory services as there is no valid medical prescription to support these orders; and (4) the ALJ abused his discretion when he determined CCS was required to utilize the IEP development process to obtain (a) parental consent to any changes in L.M.'s medically-based OT and PT, and (b) an OAH order to override a parent's objection to a change in medically-based services. With respect to its claim for declaratory relief, the Department asserted it was seeking "a declaration establishing the respective responsibilities between the parties to guide them as they continue to service [L.M.][,]" namely a declaration establishing the Educational Agencies' duty to provide awarded OT and PT in this matter. The Parents and Educational Agencies filed separate oppositions to the Department's opening brief.

After oral argument on the petition, the trial court took the matter under submission. On January 2, 2015, the trial court issued a written order in which it denied all of the Department's claims.[13] The trial court first addressed the Department's

---

[13] No statement of decision was requested.

14.

contention that the OAH did not have jurisdiction over CCS.  Citing section 7586, subdivision (a), the trial court explained: "[I]t appears that even though CCS-provided medically necessary PT and OT were not intended to be provided for purposes of providing a FAPE under IDEA, California has determined that disputes arising about such services when listed in the child's IEP shall be heard in an IDEA due process hearing.  Further, all hearing requests that involve multiple services that are the responsibility of more than one state department '*shall give rise to one hearing with all responsible state of local agencies joined as parties*.'  (§ 7576, subd. (c), emphasis added.)"  Since the OAH had jurisdiction to hear due process claims arising under the IDEA and California special education law, the trial court determined that the OAH had jurisdiction over CCS.

With respect to the writ of administrative mandamus, the trial court found that while the Department's "opening brief" contained "a statement of parties, background and statutory/regulatory overview, CCS's role and responsibilities, [L.M.]'s services and the due process hearing, *citations to the administrative record are non-existent*."  The trial court explained that because the Department failed to support many of its arguments by appropriate reference to the record, including exact page citations, it was unable to adequately evaluate which facts the Department believed supported its legal positions.  Accordingly, the trial court denied the petition for a writ for administrative mandamus.

On the writ of ordinary mandamus, the trial court noted the two basic requirements to issue such a writ: (1) a clear, present, ministerial duty owed by the agency or official; and (2) the petitioner's clear, present beneficial right to performance of that duty.  The trial court further noted that relief is available when an agency has abused its discretion, which is established if the findings are not supported by substantial evidence, and where factual findings are not challenged, the trial court need only determine whether the agency's ruling was so arbitrary and capricious as to amount to an abuse of discretion.

The trial court stated that the Department was not challenging the ALJ's factual findings; it only alleged the OAH failed to correctly apply the law.

After listing the number of witnesses, the length of the administrative record, and the number of factual findings and legal conclusions in the OAH decision, the trial court stated that "the evidence adduced in the case was more than substantial; it was overwhelming[,]" and found "the findings and decisions in the case were supported by substantial evidence so that there was no abuse of discretion by the ALJ." The trial court reviewed each of the Department's allegations of error presented in the petition and in response to each, cited to the portion of the OAH decision that supported the ALJ's legal conclusions. The trial court determined that the Department failed to prove that the ALJ abused his discretion and substantial evidence supported the ALJ's order, and therefore denied the petition for writ of ordinary mandamus.

With respect to declaratory relief, the trial court noted that the Department specifically was seeking a determination affirming the Educational Agencies' responsibility to provide the non-medically necessary services the ALJ awarded, thus arguing, in effect that the Educational Agencies were necessary parties that must be joined in the action. The trial court explained that the Educational Agencies were dismissed as parties to the OAH proceeding in December 2012 and "the court ordered CCS to reinstitute [L.M.]'s therapies level from three years ago[,]" but the Department asserted it was highly likely another dispute would arise between the parties concerning the appropriate level of OT and PT services "at some point in the future." The trial court found this statement to be "conjecture and speculative[,]" explaining that Parents had settled all claims regarding educationally-related services with the Educational Agencies, the only remaining issues for hearing concerned CCS's provision of medically necessary services, CCS participated in the hearing with counsel and had ample opportunity to defend itself, and the ALJ determined it was the Educational Agencies' responsibility to convene IEP meetings, not CCS's, and therefore CCS could not be held liable for any

16.

failure in that regard.  Accordingly, the trial court denied the Department's request for declaratory relief.

Finally, the trial court found Parents were the prevailing party in the instant action, and therefore were entitled to reasonable attorney fees and costs, and because the ALJ found L.M. was the prevailing party in the due process hearing, she was entitled to reasonable attorney fees and costs incurred in that proceeding.

Judgment against the Department was entered on January 23, 2015, which ordered the Department to fully comply with the ALJ's order and to pay L.M. reasonable attorney fees and costs associated with both the due process hearing and the superior court action.

## DISCUSSION

I.     Writs of Mandate

A. Standard of Review

" 'Judicial review of most public agency decisions is obtained by a proceeding for a writ of ordinary or administrative mandamus.  (Code Civ. Proc., §§ 1085, 1094.5.)  The applicable type of mandate is determined by the nature of the administrative action or decision.  [Citation.]  Usually, quasi-legislative acts are reviewed by ordinary mandate and quasi-judicial acts are reviewed by administrative mandate.' [Citation.]  There are subtle differences between the scope of judicial review applied to ordinary mandamus and that used for administrative mandamus.  [Citation.]  Regardless of the writ involved, however, where the facts are undisputed, the reviewing court faces a question of law. 'On questions of law arising in mandate proceedings, we exercise independent judgment.' " (*Santa Clara Valley Transportation Authority v. Rea* (2006) 140 Cal.App.4th 1303, 1313 (*SCVTA*).)  In those circumstances, the trial and appellate courts perform the same function.  (*Ibid.*)

Here, the Department sought both a traditional and administrative writ of mandate in its petition.  The trial court summarily denied the petition for administrative mandamus on the ground that the Department's opening brief did not contain adequate citations to

17.

the administrative record. With respect to traditional mandamus, the trial court reviewed the Department's contentions of error that were also alleged in its cause of action for a writ of administrative mandamus, and found that the Department failed to prove the ALJ abused his discretion and substantial evidence supports the ALJ's order.

The Department contends the trial court erred by summarily denying the writ of administrative mandate and applying the wrong standard of review. On the first issue, the Department asserts that it was not required to include citations to the administrative record in its petition, and it provided sufficient citations in its memorandum of points and authorities in support of the petition to allow the trial court to review its claims. On the second issue, the Department argues that because the facts are undisputed, the trial court was required to apply the independent judgment standard of review, yet it failed to do so. The Department urges us not to remand for rehearing if we find error, but to undertake our own independent review of the issues presented. In support, the Department cites *South Coast Newspapers, Inc. v. Superior Court* (2000) 85 Cal.App.4th 866, 873 fn. 7, in which the appellate court did not remand the case even though the trial court failed to make express findings on the necessary elements of the applicable legal standard because its independent review of the record convinced it that the applicable standard was not satisfied, and *Knight v. McMahon* (1994) 26 Cal.App.4th 747, 754, in which the appellate court stated that while the trial court should have ruled on the merits of the issue, "[b]ecause the issue is one of law, it would serve no useful purpose to remand it to the trial court. Had the trial court decided the issue, it would be before us for our independent review."

We agree with the Department that the issues involved here are questions of law on undisputed facts. As Parents acknowledge, this case requires us to interpret Chapter 26.5 of the Government Code in the context of both the Education Code and the IDEA. " ' "[T]he interpretation and application of a statutory scheme to an undisputed set of facts is a question of law . . . which is subject to de novo review on appeal. . . ." ' "

(*M & B Construction v. Yuba County Water Agency* (1999) 68 Cal.App.4th 1353, 1359 (*M & B*).) While Parents assert that we are to give "due weight" to the administrative proceeding and should defer to the ALJ's expertise, citing *Board of Education v. Rowley* (1982) 458 U.S. 176, 206 and *Union Sch. Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1524, an ALJ's statutory interpretation is reviewed de novo. (*Arizona State Bd. for Charter Schools v. U.S. Dept. of Educ.* (9th Cir. 2006) 464 F.3d 1003, 1006.)

Since the material facts are undisputed and the only question is interpretation of a statute, the distinction between traditional or administrative mandamus makes no difference in this appeal. (*M & B, supra,* 68 Cal.App.4th at p. 1359.) "In such a situation, we exercise independent judgment, whether the issue arises by traditional or administrative mandate." (*Ibid.*) Accordingly, we need not determine whether the trial court erred in summarily denying the petition for writ of administrative mandamus because the Department's claim for a writ of traditional mandamus remains. (*City of Fremont v. Board of Administration* (1989) 214 Cal.App.3d 1026, 1030 [explaining that "it is immaterial" whether the plaintiff should have proceeded by way of petition for writ of traditional instead of administrative mandamus, since "[t]he proper interpretation and application of the law is ultimately a judicial function, no matter how invoked"].) We also need not decide whether the trial court applied the incorrect standard of review, since we apply our independent judgment without reference to the trial court's actions. (*SCVTA, supra*, 140 Cal.App.4th at p. 1313.)

"In exercising our independent judgment, we rely upon settled rules of statutory construction. ' "Statutes are to be interpreted in accordance with their apparent purpose. . . ." (*Kaiser Foundation Health Plan, Inc. v. Lifeguard, Inc.* (1993) 18 Cal.App.4th 1753, 1762.) First and foremost, we look for that purpose in the actual language of the statute. (*Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753, 763.) If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998.) If the

19.

meaning of the words is not clear, we may refer to various extrinsic aids, including the history of the statute, to determine the intent of the Legislature. (*Kaiser Foundation Health Plan, Inc. v. Lifeguard, Inc., supra,* 18 Cal.App.4th at p. 1762.) Finally, if neither the words of the statute nor its legislative history reveal[s] a clear meaning, we apply reason and practicality, and interpret the statute in accord with common sense and justice, and to avoid an absurd result.' " (*SCVTA, supra,* 140 Cal.App.4th at pp. 1313-1314.)

With these principles in mind, we turn to the merits of the Department's claims.[14]

B. Jurisdiction

The Department first contends that CCS should have been dismissed from the due process hearing because Parents' failure to use another administrative forum to contest CCS's determination regarding L.M.'s medical services divested the OAH of jurisdiction to hear their complaint regarding CCS's prescription for OT and PT. The Department

---

[14] The Department, Parents, Educational Agencies, and Amicus Curiae California School Board Association, have all filed requests for judicial notice. The following documents are subjects of the various requests: (1) an unpublished Ninth Circuit Court of Appeal decision, *Douglas v. California Office of Administrative Hearings* (9th Cir. 2016) 650 Fed.Appx. 312, and the United States District Court decision it reversed, *Douglas v. California Office of Administrative Hearings* (N.D.Cal. 2015) 78 F.Supp.3d 942; (2) decisions issued by the OAH in related special education due process hearings, *Parent on Behalf of Student v. California Children's Services* (OAH, Apr. 19, 2012, No. 2011060589), *Parents v. California Children's Services* (OAH, Jul. 2, 2015, No. 2014120903, 115 LRP 30635, *Los Angeles County Office of Education* (OAH, Mar. 16, 2011, No. 2010110325, and *Los Angeles County Office of Education* (OAH, Feb. 7, 2011, No. 2010110301); (3) United States Department of Education, Office of Special Education Programs, letter to Ruth K. Forer, Nov. 4, 1980; (4) United States Department of Education, Office of Special Education and Rehabilitative Services, Dispute Resolution Procedures Under Part B of the Individuals with Disabilities Education Act (Part B) (July 23, 2013); and (5) an August 24, 2016 "Ruling on Submitted Matter and Order: Petition for Writ of Mandamus" issued in *State of California, Department of Health Care Services v. Office of Administrative Hearings*, Sacramento Superior Court Case No. 34-2013-80001557. Pursuant to Evidence Code sections 459, subdivision (a), and 452, subdivisions (b), (c) and (d), all requests for judicial notice are granted.

asserts that only CCS may determine whether OT and PT services are medically necessary, and therefore the OAH does not have authority to decide this issue.[15]

To address the Department's claim, we must first review the statutory framework. Under the IDEA, a state's educational agency is responsible for meeting the IDEA's requirements. (20 U.S.C. § 1412(a)(11)(A).) Individual states, however, may assign responsibility for the provision of related services to other agencies. (20 U.S.C. § 1412(a)(12).) In California before 1984, state and LEAs were responsible for providing both special education and all related services to students with disabilities. (*California School Bds. Assn. v. Brown* (2011) 192 Cal.App.4th 1507, 1514 (*California School Bds.*); see *Nevada County Office of Education v. Riles* (1983) 149 Cal.App.3d 767, 775-776 [because the IDEA's predecessor established the educational agency as the entity for ensuring the provision of educational and related services, CCS was not a necessary party to a special education due process hearing.].)[16]

---

[15] There are no published California cases that address this issue. In 2015, the United States District Court for the Northern District of California held that a hearing officer in a special education due process hearing does not have authority to determine what CCS services are medically necessary, as that authority is limited to the Department. (*Douglas v. California Office of Administrative Hearings, supra,* 78 F.Supp.3d at p. 949.) In 2016, the Ninth Circuit Court of Appeals reversed the district court, finding that a parent may initiate a due process hearing to seek review of CCS's determination of medical necessity in a child's IEP, and therefore CCS was not beyond the jurisdiction of a hearing officer. (*Douglas v. California Office of Administrative Hearings, supra,* 650 Fed.Appx. at pp. 314-315.) In so holding, the Ninth Circuit acknowledged that a similar issue was pending before us in the instant action, yet it decided the case, rather than defer submission or certify the question to the California Supreme Court, in the interest of judicial expediency. (*Id.* at p. 316.)

[16] To satisfy their obligation to provide a FAPE, however, California state or LEAs entered into interagency contracts with other state agencies to provide related services. For example, CCS has provided medically necessary OT and PT through its Medical Therapy Program to students in public schools since at least 1969. (See former Health & Saf. Code, § 267, added by Stats. 1968, ch. 1316, § 1, pp. 2485, 2490, and reenacted as Health & Saf. Code, § 123950 by Stats. 1995, ch. 415, § 8, p. 3147.)

This changed with the enactment of Chapter 26.5 of the Government Code, entitled "Interagency Responsibilities for Providing Services to Children with Disabilities."[17] (§ 7570 et seq.; hereafter Chapter 26.5.) (*California School Bds.*, *supra*, 192 Cal.App.4th at p. 1514.) Through Chapter 26.5, the Legislature intended to maximize and coordinate existing services rendered by state and local government agencies serving children with disabilities, and to clarify "specific state and local interagency responsibilities . . . in order to better serve the educational needs" of those children. (Stats. 1984, ch. 1747, § 1, p. 6370.)

To that end, Chapter 26.5 makes "the provision of related services, as defined in [the IDEA], and designated instruction and services, as defined in [the Education Code]," the "*joint responsibility* of the Superintendent of Public Instruction and the Secretary of Health and Human Services Agency." (§ 7570, italics added.) Chapter 26.5 and its implementing regulations, contained in Title 2, section 60000 et seq. (Chapter 26.5 regulations), delineate those joint responsibilities.[18] The LEA and the Department, through CCS, are jointly responsible for the provision of OT and PT as a related service.[19] (§ 7575.) CCS is required to provide "medically necessary" OT and PT[20] "by

---

[17] Chapter 26.5 originally was added as Chapter 26, "Interagency Responsibilities for Providing Services to Handicapped Children," by Stats. 1984, ch. 1747, § 2, operative July 1, 1986. Chapter 26 was renumbered Chapter 26.5 and amended by Stats. 1986, ch. 248, § 52, and later amended by Stats. 2002, ch. 1168, § 73, eff. September 30, 2002.

[18] The Chapter 26.5 regulations apply to the Department and its designated local agencies, as well as the Department of Education and LEAs. (Tit. 2, § 60000.) The intent of the Chapter 26.5 regulations is to assure conformity with IDEA and its implementing regulations; therefore they are to "be construed as supplemental to, and in the context of, federal and state laws and regulations relating to interagency responsibilities for providing services to pupils with disabilities." (Tit. 2, § 60000.)

[19] As authorized by section 7571, the Secretary of the Health and Human Services Agency has designated the Department, and the Department's designated local agencies, as the entities "to assume the responsibilities described in section 7570" and "to coordinate the service responsibilities described in section 7572." (Tit. 2, § 60000.)

22.

reason of medical diagnosis and when contained in the child's [IEP]" (§ 7575, subd. (a)(1)),[21] while qualified personnel from LEAs are required to provide related services the Department does not deem to be medically necessary but which the child's IEP team "determines are necessary in order to assist a child to benefit from special education." (§ 7575, subd. (a)(2).)[22] The Department "determine[s] whether a [CCS] eligible pupil, or a pupil with a private medical referral[,] needs medically necessary [OT] or [PT]." (§ 7575, subd. (b).)

Before a child may be provided related services, including OT and PT, qualified persons must assess the child in all areas related to the suspected disability. (§ 7572, subd. (a).) Qualified medical personnel are required to conduct OT and PT assessments as specified in regulations developed by the Department in consultation with the Department of Education. (§ 7572, subd. (b).)[23] The IEP team "shall only" add a related

---

[20] "Medically necessary" OT and PT is defined as "those services directed at achieving or preventing further loss of functional skills, or reducing the incidence and severity of physical disability." (Tit. 2, § 60300, subd. (n).)

[21] Section 7575, subdivision (a)(1) provides: "Notwithstanding any other provision of law, the State Department of Health Care Services, or any designated local agency administering the [CCS], shall be responsible for the provision of medically necessary [OT] and [PT], as specified by [the Crown Act], by reason of medical diagnosis and when contained in the child's [IEP]."

[22] Section 7575, subdivision (a)(2) provides: "Related services or designated instruction and services not deemed to be medically necessary by the State Department of Health Care Services, that the [IEP] team determines are necessary in order to assist a child to benefit from special education, shall be provided by the [LEA] by qualified personnel whose employment standards are covered by the Education Code and its implementing regulations."

[23] Title 2, section 60320, states the referral and assessment procedure. If the LEA decides to refer the pupil to CCS for an assessment, CCS first determines if the pupil has a "medical therapy program eligible condition[,]" which includes, as relevant here, cerebral palsy. (Tit. 2, §§ 60320, subds. (a), (c) & (e), 60300, subd. (j).) If so, CCS proposes a therapy assessment, obtains the parents' consent for assessment of the need for medically necessary OT or PT, and sends a copy of the consent to the LEA, which sets a date for the IEP team meeting. (Tit. 2, § 60320, subds. (f) & (g).)

service to a child's IEP if a "formal assessment" has been conducted by a qualified person who recommends the service "in order for the child to benefit from special education." (§ 7572, subd. (c).)

When the IEP team is considering whether to include OT and PT as a "related service" in the child's IEP, the LEA is required to invite the "responsible public agency representative" to meet with the IEP team to determine the need for the service and participate in developing the IEP. If the representative cannot attend the meeting, he or she must provide written information concerning the need for the service, and the LEA must ensure a qualified substitute is available to explain and interpret the evaluation. (§ 7572, subd. (d); see also Tit. 2, § 60325, subd. (b) ["CCS shall participate in the IEP team as set forth in Government Code Section 7572(d)"].)

A parent who disagrees with the OT or PT assessment may require the assessor to attend the IEP meeting. (§ 7572, subd. (c)(1).) A parent also may obtain an independent assessment, which the assessor must review, and require the assessor to attend the IEP meeting. (§ 7572, subd. (c)(2).) In either case, after review and discussion, the

---

The Medical Therapy Conference (MTC) then assesses the pupil's need for OT and PT, determining medical necessity based on the pupil's physical and functional status. (Tit. 2, §§ 60323, subd. (a), 60300, subd. (a).) The MTC reviews the therapy plan and is responsible for approving it. Either the MTC physician writes the prescription for the services to be provided to the pupil under the physician's supervision or reviews prescriptions submitted by the pupil's private physician for compliance with the program's requirements. (Tit. 2, § 60323, subd. (c).) Medically necessary therapy services are provided at the level dependent on the pupil's physical and functional status as determined and prescribed by the CCS paneled physician. (Tit. 2, § 60323, subd. (d).)

If CCS determines a pupil needs medically necessary OT or PT, CCS provides the LEA and parents a copy of the completed assessment report for therapy or a proposed therapy plan before the scheduled IEP meeting. If CCS determines a pupil does not need medically necessary therapy, CCS provides the LEA and parents with the completed assessment report for therapy and a statement delineating the basis for the determination. (Tit. 2, §§ 60320, subds. (h) and (i), 60325, subd. (a) ["CCS shall provide a copy of the assessment and evaluation report and the proposed therapy plan to the IEP team"].)

assessor's recommendation becomes the recommendation of the IEP team members who represent the LEA. (§ 7572, subd. (c)(1) & (2).)

Once medically necessary OT or PT is included in a child's IEP, CCS is required to notify the IEP team and parent in writing of any decision to "increase, decrease, change the type of intervention, or discontinue services for a pupil receiving medical therapy services." (Tit. 2, § 60325, subd. (c).) The LEA then is required to convene the IEP team to "review all assessments, request additional assessments if needed, determine whether fine or gross motor or physical needs exist, and consider designated instruction and services or related services that are necessary to enable the pupil to benefit from the special education program." (Tit. 2, § 60325, subds. (d) & (e).)

It is apparent from Chapter 26.5 and its implementing regulations that CCS determines in the first instance whether a child with a disability needs medically necessary OT and PT, and it can later decide to modify or discontinue such services if the child's medical need for the services changes. The question here is whether parents who disagree with CCS's medical necessity determination may seek review of that decision in a due process hearing under California's implementation of the IDEA. The Department argues that because a California regulation, Title 22, section 42140, sets out a procedure a parent may follow when a dispute arises over CCS's medical necessity determination, that regulation "expressly divest[s] OAH of jurisdiction in a dispute over the physician's prescription." Instead, the Department argues, parents who disagree with the provision of medically necessary OT and PT must engage in CCS's dispute resolution procedure. The Department contends that because Parents did not follow this procedure, the ALJ did not have authority to hear their dispute concerning CCS's medical assessment and prescription.

CCS's jurisdictional argument fails because, not only is it responsible for providing medically necessary services to L.M., it is also responsible for providing related services in L.M.'s IEP. OT and PT services that are included in a child's IEP –

25.

whether medically or educationally necessary – are "related services[,]" since they are necessary "to assist an individual with exceptional needs to benefit from special education." (Ed. Code, § 56363, subd. (a); *accord* 20 U.S.C. § 1401(26)(A).) If medically necessary OT and PT services were not also necessary for a child to benefit from special education, they would not need to be included in the child's IEP. Therefore, OT and PT services, even those CCS determines are medically necessary, constitute a "related service" when they are part of a child's IEP. Moreover, Chapter 26.5 makes it clear that CCS, in providing medically necessary OT and PT, is discharging its joint responsibility for providing related services as defined in the IDEA, which are an essential component of a FAPE. (See § 7570; 20 U.S.C. § 1401(9).)

Since CCS provides a related service when its medically necessary OT and PT is included in a child's IEP under Chapter 26.5, any dispute concerning CCS's provision of such services may be resolved in special education due process hearings. Section 7572, subdivision (c)(3) provides that disputes between parents and IEP "team members representing the public agencies" regarding recommendations by medical personnel and the IEP team concerning related services "shall be resolved" in due process hearings.[24] Although section 7585 sets out a procedure for resolving disputes between the Department of Education or a LEA on the one hand, and CCS or the Department on the

_____

[24] Section 7572, subdivision (c)(3) provides: "Any disputes between the parent and team members representing the public agencies regarding a recommendation made in accordance with paragraphs (1) and (2) shall be resolved pursuant to Chapter 5 (commencing with Section 56500) of Part 30 of Division 4 of Title 2 of the Education Code."

The referenced Education Code sections define the scope of special education due process hearings. Education Code section 56501, subdivision (a), provides that special education due process hearings extend to the parent or guardian, to certain pupils, and to "the public agency involved in any decisions regarding a pupil." A "public agency" is defined as "a school district, county office of education, special education local plan area . . . or *any other public agency . . . providing* special education or *related services to individuals with exceptional needs*." (Ed. Code, § 56028.5, emphasis added.)

other, over the provision of OT and PT when contained in an IEP, the statute also specifically provides that a parent or adult pupil may still file for a due process hearing under section 7586. (§ 7585, subd. (g); Tit. 2, § 60600 [discussing application of procedures specified in § 7585].) Finally, section 7586, subdivision (a), provides that *all* state departments and their designated local agencies are governed by the IDEA's procedural safeguards, the "[r]esolution of *all issues*" shall be through a special education due process hearing, and the decision issued in that hearing is binding on the department that is responsible for the services in issue. (Emphasis added.)[25]

Thus, Chapter 26.5 specifically maintains a parent's right to a special education due process hearing over related services, including medically necessary OT and PT, when those services are part of the child's IEP. This conclusion also finds support in the Chapter 26.5 regulations, which specifically state that "[d]ue process hearing procedures apply to the resolution of disagreements between a parent and a public agency regarding

---

[25] Section 7586 provides in its entirety:

"(a) All state departments, and their designated local agencies, shall be governed by the procedural safeguards required in Section 1415 of Title 20 of the United States Code. A due process hearing arising over a related service or designated instruction and service shall be filed with the Superintendent of Public Instruction. Resolution of all issues shall be through the due process hearing process established in Chapter 5 (commencing with Section 56500) of Part 30 of Division 4 of the Education Code. The decision issued in the due process hearing shall be binding on the department having responsibility for the services in issue as prescribed by this chapter.

"(b) Upon receipt of a request for a due process hearing involving an agency other than an educational agency, the Superintendent of Public Instruction shall immediately notify the state and local agencies involved by sending a copy of the request to the agencies.

"(c) All hearing requests that involve multiple services that are the responsibility of more than one state department shall give rise to one hearing with all responsible state or local agencies joined as parties.

"(d) No public agency, state or local, may request a due process hearing pursuant to Section 56501 of the Education Code against another public agency."

the proposal or refusal of a public agency to initiate or change the identification, assessment, educational placement, or the provision of special education and related services to the pupil." (Tit. 2, § 60550.)

Title 2, section 60550, subdivisions (b), (c) & (d), explain the procedure for such due process hearings: (1) upon receipt of a request for a due process hearing regarding the services provided or refused by another agency, the Superintendent of Public Instruction sends the hearing request to the state and local agencies, along with information concerning the mediation in accordance with Education Code section 56503; (2) if the mediator cannot resolve the issues, a hearing officer conducts a state level hearing in accordance with Education Code section 56505; and (3) each agency involved in a proposal or refusal to provide a service is responsible for preparing documentation and providing testimony for the hearing officer.

Title 2, section 60550, subdivision (e) requires the hearing officer to be knowledgeable in the laws governing administrative hearings, Chapter 26.5's provisions, and the applicable laws relevant to special education and CCS. Further, for hearings related to the provision of OT or PT, the hearing officer is required to rule according to section 7575, subdivision (a), which specifies that CCS is responsible for providing medically necessary OT and PT "by reason of medical diagnosis and when contained in the pupil's IEP[,]" and the LEA is responsible for OT and PT that it determines is "necessary in order to assist the pupil to benefit from special education[,]" but CCS does not deem to be medically necessary. (Tit. 2, § 60550, subd. (e).) The hearing decision is the final administrative determination regarding the provision of educational and related services, and is binding on all parties. (Tit. 2, § 60500, subd. (f).)

The OAH's jurisdiction is also confirmed by provisions of the local interagency agreement, which describes the relative duties of CCS and the Educational Agencies in

28.

providing related services contained in IEPs.[26]  The "Dispute Resolution" section in the Interagency Agreement Between Tuolumne County Superintendent of Schools and Tuolumne County Health Department California Children Services for Fiscal Years 2009/2010, 2010/2011, 2011/2102 (Local IA), provides: "When CCS is joined in a special education fair hearing, the local CCS program shall follow the CCS administrative procedures for fair hearings"; until the hearing officer makes a decision, the MTP must continue to provide the same level of CCS medically necessary OT or PT the child was receiving prior to the parent's request for a fair hearing; when the fair hearing decision is not in CCS's favor, "the State CCS Program 'will develop and implement a plan for the provision of therapy services for the duration and at the frequency stated in the fair hearing decision'; and when the fair hearing decision is in CCS's favor, the education agencies must pay CCS "for the continuation of therapy services that were provided beyond what was considered medically necessary and provided by the MTP during the pendency of the fair hearing decision."

Chapter 26.5, its implementing regulations, and the Local IA all support the conclusion that CCS is subject to the OAH's jurisdiction when, as here, a parent disputes CCS's provision of medically necessary OT and PT that are included in a child's IEP. CCS does have its own internal procedures for resolving disputes over medically necessary services, which it offered to Parents.  Under Title 22, section 42140, subdivision (a), parents have the right to appeal a CCS decision *except* when a CCS physician who is responsible for the medical supervision of their child has ordered or terminated the service under dispute.  If, as here, parents disagree with the CCS physician's decision, the parents are provided the names of three expert physicians, one of whom the parents choose to evaluate the child at CCS expense, and all parties are

---

[26] Title 2, section 60310, requires the development of local interagency agreements between CCS and LEAs to facilitate the provision of medically necessary OT and PT.

29.

bound by the chosen physician's determination. (Tit. 22, § 42140, subd. (a).) No further right to appeal the physician's order exists.[27]

The Department contends Parents were required to pursue the CCS appeals process, asserting "[i]t would be inappropriate and inefficient to allow a CCS client to thwart" that process by challenging CCS services through another legal channel. Citing to the rule of exhaustion of administrative remedies as stated in *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321 (*Campbell*), the Department contends Parents were required to exhaust the CCS appeal process, since whether a service is medically necessary is not an appropriate issue to be addressed by a judicial officer.

The rule the Department cites provides " 'that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' " (*Campbell*, *supra*, 35 Cal.4th at p. 321.) " 'Exhaustion of *administrative* remedies is a "jurisdictional prerequisite to resort to the courts." ' " (*Ibid.*) But here Parents did pursue the administrative remedy provided by statute, namely the due process hearing procedure set forth in section 7586, when they sought review of CCS's unilateral decision to reduce L.M.'s medically necessary OT and PT contained in L.M.'s IEP. If the CCS appeal process were Parents' sole remedy to address their complaints, they would have no right to a special education due process hearing. Such a result is contrary to the due process rights expressly conferred under Chapter 26.5, specifically section 7586, subdivision (a).

In an attempt to avoid this result, the Department urges us to apply the principle of statutory construction that a specific statute controls over a general statute covering the same subject, citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank* (2012)

---

[27] Appeals of all other CCS decisions are appealed first to the local CCS agency charged with serving the client, which internally determines its own client's appeal (Tit. 22, § 42160), and if the client is still unsatisfied, the client may pursue a state level fair hearing. (Tit. 22, § 42180.)

132 S.Ct. 2065, 2070-2071, and *Shewry v. Wooten* (2009) 172 Cal.App.4th 741, 747. The Department contends that because section 7575, subdivision (b), makes it the "sole arbiter of what is 'medically necessary[,]' " this is a specific statute which controls over the general statute, section 7572, which grants parents a right to a due process hearing when there is a dispute over related services. The Department argues the two statutes conflict and asserts there is no authority that specifically grants the OAH the ability to override a CCS physician's prescription for medical services.

The Department's argument fails. The statute it claims is the specific one, section 7575, is only one brick in the statutory scheme that is Chapter 26.5. Under section 7575, CCS determines the medical necessity of OT and PT. If a parent disagrees with that determination, they can request a special education due process hearing. (§§ 7572, 7586.) The OAH may decide the issue, ruling in accordance with section 7575's mandate that CCS is only required to provide medically necessary OT and PT.[28] (Tit. 2, § 60550, subd. (e).) Thus there is no conflict between the two statutes; instead, they act in harmony in order to preserve a parent's due process rights under the IDEA.

In enacting Chapter 26.5, the Legislature has determined that "[a]ll state departments" are governed by the IDEA's procedural safeguards, and that "[r]esolution of all issues" concerning a related service are to be resolved in a special education due process hearing. (§ 7586, subd. (a).) As we have already explained, the implementing regulations and Local IA support that intent. "When the statutory language is unambiguous, ' "we presume the Legislature meant what it said and the plain meaning of

---

[28] Here, the ALJ did not reach the issue of whether CCS denied L.M. a FAPE by failing to provide adequate OT and PT services, and therefore did not decide the issue of medical necessity of prospective services. Accordingly, we need not, and do not, determine the showing required to challenge CCS's determination of medically necessary OT and PT services. We hold only, as did the ALJ, that CCS's determination of the level and type of medically necessary OT and PT for an eligible pupil may be challenged through a special education due process hearing.

the statute governs." ' " (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1261.) Since Chapter 26.5 unambiguously provides that "all issues" concerning related services, including medically necessary OT and PT, shall be resolved in a special education due process hearing, the OAH had jurisdiction over Parents' claims.[29]

## C. The Order for Compensatory OT and PT, and Restoration of Services

The ALJ found that CCS committed procedural violations that denied L.M. a FAPE by (1) unilaterally reducing L.M.'s medically necessary OT and PT services in November 2011 and September 2012 outside of the IEP team meeting process, and (2) failing to consider independent assessments. Other than arguing that the OAH did not have jurisdiction over CCS, the Department does not challenge these findings on the merits in its appellate briefs. Instead, the Department contends the ALJ acted in excess of his authority when he awarded compensatory education, which required CCS to provide 40 hours of direct compensatory OT and 50 hours of direct compensatory PT services, and restoration of L.M.'s medically necessary OT and PT to the level provided for in her last agreed-upon IEP of June 2011.

---

[29] Amicus Curiae California State Association of Counties (CSAC) makes various public policy arguments in support of the Department's position. CSAC contends that allowing a parent to challenge a CCS decision in a special education due process hearing "would have serious repercussions on the provision of services to children with disabilities in California[,]" as it would: (1) "open the floodgates" to demands for CCS to provide non-medically necessary PT and OT services; (2) allow parents to ignore the requirement that a CCS-certified physician provide a second evaluation of a child when they are dissatisfied with the initial CCS determination; (3) place the OAH and federal courts in the position of resolving disputes about a child's medical need for therapy; (4) upend the Legislature's long-standing division of agency responsibilities by forcing CCS to provide services that are not medically necessary; and (5) compromise CCS' ability to serve truly needy children given its limited resources and costly nature of services. Given that the Legislature, in enacting Chapter 26.5, clearly granted parents the right to request a special education due process hearing when they disagree with a CCS determination, CSAC's arguments are properly addressed to the Legislature, not to us. (See, e.g., *Gallo Glass Co. v. Superior Court* (1983) 148 Cal.App.3d 485, 489.)

Specifically, the Department argues that because only CCS may determine whether OT and PT are medically necessary and the "uncontested evidence" demonstrated that increased services were not medically necessary, the ALJ did not have authority to award OT and PT as compensatory services or to restore services. The Department further argues the ALJ abused his discretion when he ordered CCS, not the Educational Agencies, to provide the awarded services, as the Educational Agencies are responsible for ensuring the provision of a FAPE and financially responsible for providing related services. The Department asks us to affirm that the Educational Agencies are responsible for the awarded services as dictated by section 7575, and overturn the ALJ's decision holding CCS responsible for providing the services.

We disagree with the Department. Since CCS is subject to special education due process hearings when there is a dispute regarding medically necessary OT and PT that is included in an IEP as a related service, and under section 7586 "all issues" regarding related services are to be resolved in that proceeding, the ALJ had the authority to exercise his equitable powers and order CCS to provide compensatory services and restoration of L.M.'s services to the prior levels.[30] Compensatory education is an equitable remedy by which hearing officers "may award 'educational services . . . to be provided prospectively to compensate for a past deficient program.' " (*Reid ex rel. Reid v. District of Columbia* (D.C. Cir. 2005) 401 F.3d 516, 522 (*Reid*).) This "entails a fact-specific, individualized assessment of a student's current needs." (*Cupertino Union Sch. Dist. v. K.A.* (N.D. Cal. 2014) 75 F.Supp.3d 1088, 1105-1106 (*Cupertino*); see also *Parents of Student W. v. Puyallup Sch. Dist., No. 3* (9th Cir. 1994) 31 F.3d 1489, 1496;

_____

[30] The Department relies on *Natalie D. v. State Dept. of Health Care Services* (2013) 217 Cal.App.4th 1449, in support of its argument that only a CCS physician may decide the appropriate level of medically necessary services. That case, however, did not involve CCS services that were also related services in a student's IEP. Thus, Chapter 26.5 was not at issue and the procedural safeguards of the Education Code and IDEA did not apply.

33.

*School Comm. of Burlington v. Dep't of Educ.* (1985) 471 U.S. 359, 374.) " 'Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA.' " (*Cupertino*, *supra*, 75 F.Supp.3d at p. 1106.) The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Reid*, *supra*, 401 F.3d at p. 524.)

The Department complains that the ALJ's decision usurped its authority to determine medical necessity and contravened CCS's evidence that showed L.M.'s services were not medically necessary. There was other evidence, however, to support the ALJ's order, specifically the assessment reports and testimony of Dr. Corn and Leavitt.[31] The ALJ rejected CCS's contest of these assessments on the grounds that neither therapist was a physician or conducted the assessment pursuant to CCS guidelines, as (1) Chapter 26.5 did not place any such parameters on independent

---

[31] In a footnote, the Department references an OAH decision from another special education due process hearing, *Parent on Behalf of Student v. California Children's Services* (Apr. 19, 2012) OAH Case No. 2011060589, for the proposition that only CCS has authority "to decide whether OT and PT services were 'medically necessary' under the CCS standard." The ALJ in that case: (1) found that OAH had jurisdiction over CCS; (2) determined that CCS denied the student a FAPE by unilaterally reducing his medically necessary related services outside the IEP process; and (3) ordered CCS to reinstate its services to the last agreed upon level in the student's IEP and provide compensatory services to address regression caused by CCS's denial of a FAPE. Thus, the ALJ's findings and order in that case fully support the Parents' position in this case.

Rather than appeal that decision or challenge it in court, CCS requested an interagency dispute hearing pursuant to section 7585, in which it sought reimbursement for part of the costs of the services it had been ordered to provide. The OAH denied CCS's request as it, in effect, asked for a reduction in the ordered services, which could not be changed absent a modification in the ALJ's decision or the IEP. The Department sought review of that decision through a petition for writ of mandate in *State of California, Department of Health Care Services v. Office of Administrative Hearings*, Sacramento Superior Court Case No. 34-2013-80001557, which was denied on August 24, 2016.

assessments, (2) the witnesses had extensive educational and experiential backgrounds, and (3) the assessments were not conducted solely for educational purposes, unrelated to medical necessity, but instead encompassed skills that were both medically and educationally necessary.

The ALJ found persuasive occupational therapist Leavitt's opinion that L.M. was capable of making progress and needed OT, particularly for oral motor development and hand functioning, and L.M.'s mother's testimony that L.M.'s functioning decreased when OT services were reduced and eventually eliminated. With respect to PT, the ALJ found persuasive Dr. Corn's opinion that direct therapy should not have been terminated and her description of L.M.'s positive response to direct therapy Dr. Corn provided on three occasions. The ALJ expressly did not consider this evidence to determine what L.M.'s prospective FAPE would be with respect to medically necessary OT and PT. The ALJ further found that L.M.'s mother's testimony established L.M. suffered some regression in her fine motor skills. The ALJ awarded the compensatory OT and PT based on the loss of approximately 80 hours of OT and PT, taking into account the restoration of services and based on the needs identified in the independent assessments. These findings were well within the ALJ's discretion.

With respect to restoration of services, the ALJ found that CCS's unilateral reduction of L.M.'s medically necessary OT and PT outside of, and with disregard to, the IEP development process, and in disregard of L.M.'s procedural safeguards under the IDEA, denied L.M. a FAPE. The ALJ further found that CCS was required to use the IEP development process to obtain parental consent to any changes in L.M.'s related OT and PT services that CCS recommends, or to use the due process hearing procedures to obtain an order from OAH to override parental denial of consent to changes in L.M.'s services. Until CCS followed these procedures, the ALJ ordered L.M.'s medically necessary OT and PT services set out in her June 2011 restored.

In restoring L.M.'s CCS services to their prior levels, the ALJ did not decide whether the services were medically necessary. Rather, the ALJ was acting in accordance with the Local IA, which provides that during the course of a due process hearing, CCS must continue to provide the same level of medically necessary OT and PT services L.M. was receiving prior to Parents' request for a due process hearing until the hearing officer makes a decision. At that time, either CCS will be required to continue to provide medically necessary OT and PT if the hearing officer decides against CCS, or it will be entitled to reimbursement from the Educational Agencies for the services it provided if the hearing officer decides in CCS's favor. As the ALJ pointed out, if CCS believes its services are not medically necessary, it may follow the procedures set for due process hearings, but it is required to maintain the same level of services until the due process hearing is completed.

This is consistent with federal law and state regulation. Under the IDEA, both the non-educational agency and the LEA are responsible for the continued delivery of services. (20 U.S.C. § 1412(a)(12)(B)(i) [if a public agency is obligated under state law or assigned responsibility under state policy pursuant to an interagency agreement to provide or pay for a related service, "such public agency shall fulfill that obligation or responsibility"]; 20 U.S.C. § 1412(a)(12)(B)(ii) [if the public agency fails to provide or pay for a related service, the LEA is required to provide or pay for such services, and may claim reimbursement from the public agency that failed to provide or pay for them].) Thus, during a dispute between an LEA and a non-educational state agency over the responsibility for the provision of services, the services are continued for the student's protection and the agency providing them may later obtain reimbursement for them, if appropriate. (See Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 44 Fed.Reg. 46540, 46607 (Aug. 14, 2006) ["Disagreements about the interagency agreements should not stop or delay the receipt of the services described in the child's IEP . . . [T]he State must ensure there is no

delay in implementing a child's IEP, including any situation in which the source for providing or paying for the special education or related services to a child is being determined."].)

The Chapter 26.5 regulations also provide that when there is a dispute between an LEA and CCS over the provision of related services that are contained in a child's IEP, the department or local agency that provided the service before the dispute is required to pay for or provide the service until the dispute resolution proceedings are completed. (Tit. 2, §§ 60600, 60610.) At that time, the department or local agency determined responsible for the service shall pay for or provide the service, and reimburse the agency which provided the service. (Tit. 2, § 60610.)

The provisions of federal law, the Local IA, and Chapter 26.5 and its implementing regulations, considered together, support the ALJ's decision to require CCS to provide the same level of services it provided before its procedural violations of the IDEA. CCS may not unilaterally reduce or terminate OT and PT services if they are in an IEP, but instead must continue to provide them until the dispute is resolved. If CCS prevails, it may then obtain reimbursement from the LEA.

In sum, we find no error in the ALJ's award of compensatory services and restoration of services to prior levels. Moreover, since the ALJ's decision was not erroneous, we reject the Department's request for issuance of a writ of traditional mandamus.

II.    Declaratory Relief

In its petition, CCS sought a declaration that the OAH's decision was "inconsistent with the requirements of the law." In its briefing before the trial court, CCS explained that, in its claim for declaratory relief it was seeking a "declaration establishing the respective responsibilities between the parties to guide them as they continue to service" L.M., as well as the Educational Agencies' "duty to provide any awarded OT and PT services in this matter." The Department argued that the Educational Agencies,

37.

as well as the OAH, ignored the statutory authority that only obligates CCS to provide medically necessary services, and requested an affirmation that the Educational Agencies are required to provide OT and PT services in the absence of a current prescription by a CCS-paneled physician.

On appeal, the Department contends the trial court erred in denying the request for declaratory relief. It argues the trial court failed to address the "critical inquiry: whether the ALJ's decision conflicts with Government Code section 7575, and as such, whether a judicial declaration should issue to guide future decisions concerning the rights and responsibilities of the parties." The Department asserts that a declaration is necessary because the attorneys for Parents and the Educational Agencies are repeatedly settling around the Department in other due process hearings in an effort to compel it to pay for services the Educational Agencies are responsible for providing, and asks us to direct the trial court to issue "a declaratory statement to clarify the nature of the parties' rights and obligations in light of the dictates of Government Code section 7575, subdivision (a)(2)."

The issue the Department raises, however, is the same issue it raised in its traditional and administrative mandamus claims. As the Educational Agencies argue, while declaratory relief is appropriate to establish rights between parties "in cases of actual controversy" (Code Civ. Proc., § 1060), it is not an appropriate means to obtain judicial review of an administrative decision. (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 249; see *Tri-County Special Educ. Local Plan Area v. County of Tuolumne* (2004) 123 Cal.App.4th 563, 576 [" 'The declaratory relief provisions do not independently empower the courts to stop or interfere with administrative proceedings by declaratory decree.' "].)

The Department's declaratory relief action rests primarily on its contention that the OAH erred in its interpretation of section 7575. The remedy it seeks – that it is not responsible for providing the OT and PT services the ALJ ordered – is available only by overturning the administrative decision. The Department asserts in its reply brief that the

declaratory relief claim is proper because it seeks to resolve whether the OAH has jurisdiction to order CCS to provide OT and PT services in the absence of a medical necessity determination, as here the ALJ ordered CCS to provide services that were not medically necessary and therefore must be provided by the Educational Agencies. Since review of this claim entails a review of the OAH decision, it is not a proper subject of a declaratory relief action. Accordingly, the trial court did not err in denying the Department's claim for declaratory relief.

III.    Attorney Fees

Finally, the Department contends the trial court erred in awarding L.M. her attorney fees and costs in both this action and the underlying administrative hearing. It asserts that there is no statutory basis to support such an award because this action does not fall under the IDEA's purview, since it involves only state law claims. It also argues that, even if proper, the request must be filed in federal court. We review a trial court's award of attorney fees de novo where, as here, the appellant challenges the legal basis for an attorney fee award. (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213–1214.)

Both state and federal law grant courts the authority to award attorney fees to a prevailing parent in a case involving claims under the IDEA. Education Code section 56507, subdivision (b)(1), provides: "An award of reasonable attorney's fees to the prevailing parent, guardian, or pupil, as the case may be, may only be made either with the agreement of the parties following the conclusion of the administrative hearing process or by a court of competent jurisdiction pursuant to Section 1415(i)(3) of Title 20 of the United States Code." The federal statute, 20 U.S.C. § 1415(i)(3), provides, in pertinent part: "(A) In general [¶] The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy. [¶] (B) Award of attorneys' fees [¶] (i) In general [¶] In any action or proceeding brought under this section, the court, in its discretion, may award reasonable

attorneys' fees as part of the costs – [¶] (I) to a prevailing party who is the parent of a child with a disability; . . ."

The Department contends there is no statutory basis for the attorney fee award because its lawsuit is not an action or proceeding brought under the IDEA, as its claims were state law claims for writs of mandamus and declaratory relief.[32] Even so, those claims were brought to overturn the OAH decision that was issued in a special education due process hearing in which the ALJ found that CCS committed procedural violations of the IDEA. In seeking writs of mandamus and declaratory relief, the Department argued it was not subject to the IDEA and therefore the OAH did not have jurisdiction over it. While resolution of the Department's claims required the interpretation of state law, namely Chapter 26.5, that law is part of California's implementation of the IDEA. As such, the Department's lawsuit was within the purview of the IDEA and essentially amounted to a review of the correctness of the ALJ's decision.

The Department next argues that the Parents must file their request for attorney fees in federal court. The issue here is whether state courts have concurrent jurisdiction with federal courts to award attorney fees under the IDEA. The Department asserts that federal courts have exclusive jurisdiction over claims for attorney fees under the IDEA. This assertion originates with the IDEA's attorney fees provision, 20 United States Code section 1415(i)(3), which states that "district courts of the United States shall have jurisdiction brought under this section without regard to the amount in controversy." (20 U.S.C. § 1415(i)(3)(A).) The statute does not contain any indication of whether

---

**32** Parents who prevail at an administrative hearing by obtaining affirmative relief in a proceeding brought under the IDEA are entitled to attorney fees. (*Miller ex rel. Miller v. San Mateo-Foster City Unified School Dist.* (N.D.Cal. 2004) 318 F.Supp.2d 851, 863.) Under California law, the hearing officer is required to designate the prevailing party for each issue on which a decision was rendered. (Ed. Code, § 56507, subdivision (d).) The Department does not contend that the underlying administrative proceeding was not brought under the IDEA or that Parents were not the prevailing party in either the administrative or trial court proceedings.

subdivision (A) was intended to grant federal district courts exclusive jurisdiction to award fees or concurrent jurisdiction without regard to the minimum amount in controversy.

The Department maintains that only federal district courts have jurisdiction to consider fee questions. Federal courts generally have ruled that an attorney fee claim under 20 United States Code section 1415(i)(3), is a separate proceeding from a civil action under 20 United States Code section 1415(i)(2)(A), which provides that a party aggrieved by a decision made in an administrative proceeding has the right to bring a civil action in any state court of competent jurisdiction or a United States District Court. These courts have implied, or outright stated, that fees may only be awarded in a separate action where the original claim is brought in state court. (See *Zipperer v. School Bd. of Seminole County* (11th Cir. 1997) 111 F.3d 847, 851 & fn. 2 (*Zipperer*) [stating that the IDEA provides "two distinguishable causes of action" under 20 U.S.C. § 1415(i)(2) & (3), and "the available forums are different under the two actions"]; *B.K. v. Toms River Bd. of Educ.* (D.N.J. 1998) 998 F.Supp. 462, 470 [stating that a fee action is a distinct proceeding from a civil action]; *Curtis K. by Delores K. v. Sioux City Community School Dist.* (N.D. Iowa 1995) 895 F.Supp. 1197, 1210 ["Jurisdiction over the action for attorneys fees lies not in either State or Federal court, but . . . in the 'district courts of the United States.' "].)

The parties do not cite us to any federal court decision that has faced the issue directly, and we have found none. The relevant language in *Zipperer* consists of dicta in a footnote; the remainder of the opinion does not address whether state courts are empowered to award fees under 20 United States Code section 1415(i)(3). Instead, *Zipperer* and the other cited federal cases analyzed the fee statute in terms of which analogous state statute of limitations applied to post-judgment fee claims.

In contending that state and federal courts have concurrent jurisdiction over fee claims, Parents cite to an appellate court case from Florida, *W.R. ex rel. Doe v. School*

41.

*Bd. of Osceola County* (Fla.Dist.Ct.App. 1999) 726 So.2d 801 (*W.R.*). There, agreeing with a New Jersey appellate court case, *J.H.R. v. East Brunswick Board of Education* (N.J.Super.Ct.App.Div. 1998) 705 A.2d 766 (*J.H.R.*), which directly addressed the jurisdictional issue and concluded there was concurrent jurisdiction, the Florida court held that state and federal courts have concurrent jurisdiction to award fees to prevailing parents in IDEA actions. (*W.R.*, *supra*, 726 So.2d at pp. 803-804.)

The *W.R.* court first noted that the language in 20 United States Code section 1415(i)(3)(A) – "[t]he district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy" – was simply meant to circumvent the minimum amount in controversy requirement for district courts, rather than divest state courts of jurisdiction to award fees under the IDEA. (*W.R.*, *supra*, 726 So.2d at p. 803.) The court, citing to *J.H.R.*, explained that the jurisdiction provision predated that attorney fees provision, which was added in 1986, and therefore Congress could not have intended it to apply to a not yet adopted attorney fees statute. (*W.R.*, *supra*, 726 So.2d at p. 803, citing *J.H.R.*, *supra*, 705 A.2d at pp. 776-777.) Moreover, the *W.R.* court noted the absence of explicit language divesting state courts of jurisdiction to determine attorney fee claims under the IDEA. (*W.R.*, *supra*, 726 So.2d at p. 803.)

Finally, the *W.R.* court determined that the policies underlying the IDEA, along with the notions of judicial economy, compelled a finding of concurrent jurisdiction, as nothing in the statute or interpretative case law suggested that prevailing parents in IDEA actions initiated in state court should be required to file separate actions in federal court to recover attorney fees. (*W.R.*, *supra*, 726 So.2d at p. 804.)

We agree with the courts in *W.R.* and *J.H.R.* that 20 United States Code section 1415(i)(3) grants state and federal courts concurrent jurisdiction to award attorney fees. Accordingly, the trial court had jurisdiction to award attorney fees to L.M., at both the administrative and trial court levels.

## **DISPOSITION**

The judgment is affirmed.  Costs on appeal are awarded to Real Parties in Interest.

_____
GOMES, Acting P.J.

WE CONCUR:

_____
KANE, J.

_____
DETJEN, J.