Filed 7/3/19; Certified for Publication 7/18/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SACRAMENTANS FOR FAIR PLANNING, | C086182 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201680002396CUWMGDS) |
| v. | |
| CITY OF SACRAMENTO, | |
| Defendant and Respondent; | |
| 2500 J OWNERS, LLC, | |
| Real Party in Interest and Respondent. | |

Plaintiff Sacramentans for Fair Planning contends the City of Sacramento violated zoning law and the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)) when it approved entitlements for real party 2500 J Owners, LLC, to construct a high-rise condominium building in the City's Midtown area. The project was

1

not consistent with the general plan and zoning code standards for building intensity and height.  But the City approved it pursuant to a general plan policy authorizing more intense development than zoning otherwise allowed if the project provided a significant community benefit.

The City also conducted a streamlined CEQA review.  CEQA authorizes the less intense review for a type of residential mixed-use development such as the proposed project which, because of its proximity to mass transit services, may help reduce regional greenhouse gas emissions by generating less use of motor vehicles.

In a petition for writ of mandate, plaintiff argued that approving the project under the general plan policy violated constitutional law and an implied-in-law zoning contract that required identical uses in a zoning district to be treated uniformly and prohibited a delegation of legislative authority without sufficient standards to govern its use.  Plaintiff also claimed the City violated CEQA because the streamlined review did not analyze all of the project's environmental effects.  The trial court denied plaintiff's petition.  We affirm the trial court's order and judgment.

## FACTS AND PROCEEDINGS

Real party applied to the City for permits to build a mixed-use condominium building at the southeast corner of 25th and J Streets in Midtown.  The site is .44 acres, or 19,200 square feet.  The proposed building will be 15 stories with an overall height of 178 feet, seven inches.  It will contain 177,032 square feet of space; one floor of commercial space, three levels of parking, 134 residential condominiums on 10 floors, and one floor with resident amenities.  The project is referred to as the Yamanee project.

The City's general plan designates the site as Urban Corridor Low.  There is no dispute that the project complies with the land use requirements imposed under this designation except for the standard for building intensity.  Allowable building intensity is measured in terms of floor-area ratio.  The floor-area ratio is the ratio of "gross building

area on a site, excluding structured parking, to the net developable area of the site. The net developable area is the total area of a site excluding portions that cannot be developed (e.g., right-of-way, public parks, etc.)."

Development on land designated as Urban Corridor Low is authorized to have a floor-area ratio of 0.3-3.0. The proposed building will have a floor-area ratio of 9.22. The general plan also recommends as a guideline that buildings in the Urban Corridor Low designation be from two to six stories high.

We note that in addition to building intensity standards, the general plan includes density standards based on the number of residential units per acre that may be built under the land use designation. Plaintiff argues the project also violates these density standards. Land designated as Urban Corridor Low is authorized to have a density of 20-110 residential units per acre. However, this density range does not apply to mixed-use developments such as the Yamanee project that includes residential uses because the allowable floor-area ratio includes commercial square footage.

The City's zoning code designates the site as General Commercial/Midtown Commercial (C-2-MC). There is no dispute the proposed use of the site is authorized in the C-2 zone except that the project conflicts with the zone's height limitation and building intensity standard. The maximum height allowed in the C-2 zone is 65 feet. The project will slightly exceed 174 feet. The permitted floor-area ratios in the C-2 zone are those that are set forth in the general plan.

Despite the project's noncompliance with the floor-area ratio and height limits, the City's planning staff recommended the project be approved pursuant to a unique provision in the general plan. That provision, LU 1.1.10, gives the City authority to approve projects that do not conform with building intensity standards if the projects provide significant public benefits. LU 1.1.10 states: "The City may allow new development to exceed the maximum allowed FAR [floor-area ratio] or density if it is determined that the project provides a significant community benefit."

3

The planning staff stated LU 1.1.10 "allows that there may be a circumstance where the City determines that the benefit the community would derive from the project outweighs strict adherence to the General Plan's maximum FAR." Staff detailed numerous benefits it believed the Yamanee project would provide to the community that justified its approval. For example, the project is based on a high level of design. It would contribute to the City's goal of building 10,000 new residential units in the downtown area by 2025. The project's higher density at an infill location would reduce dependency on personal vehicles and reduce carbon emissions.

The planning staff reviewed the project's environmental effects under CEQA. Staff determined the project as mitigated would not have a significant effect on the environment, and that the project qualified for review using a sustainable communities environmental assessment (SCEA) instead of the traditional negative declaration or environmental impact report. An SCEA is a relatively new method for conducting a streamlined environmental review for certain projects that assist the state in meeting its greenhouse gas reduction targets. (Pub. Resources Code, § 21155.2, subd. (b); Stats. 2008, ch. 728, § 14.)

Relying on LU 1.1.10, the City's planning and design commission approved the project's entitlements and its environmental review. The entitlements consisted of a tentative subdivision map to divide the condominium spaces and a site plan and design review. Plaintiff appealed the commission's decision to the city council. Following a public hearing, the city council unanimously denied the appeal, adopted the SCEA, and approved the tentative map and the site plan and design review.

Plaintiff petitioned the superior court for a writ of mandate, claiming the approval violated state planning and zoning law and CEQA. The court denied the petition.

4

DISCUSSION

I

*Planning and Zoning Law Contentions*

Plaintiff contends the City's approval violates planning and zoning law in three respects: (1) the approval is contrary to a constitutionally-derived doctrine of zoning uniformity and a similar implied-in-law zoning contract; (2) the approval resulted from an unlawful delegation of legislative authority; and (3) the City committed various procedural errors in approving the project. We disagree with each contention.

A.      *Standard of review*

The bulk of plaintiff's argument raises questions of constitutional law. We exercise our independent judgment on questions of law that arise in mandate proceedings. (*Department of Health Care Services v. Office of Administrative Hearings* (2016) 6 Cal.App.5th 120, 140.)

The City's approval of the project's tentative map was a quasi-adjudicatory action reviewable for abuse of discretion under Code of Civil Procedure section 1094.5. (*Youngblood v. Board of Supervisors* (1978) 22 Cal.3d 644, 651, fn. 2.) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code of Civil Proc., § 1094.5, subd. (b).)

The City's approval of the site plan and design review is similarly reviewed for substantial evidence. Under this standard, we review the administrative record to determine whether substantial evidence supports the City's findings and whether the findings support the City's decision. The burden is on plaintiff to show there is insufficient evidence to support the City's findings. (*Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 174-175.)

5

We review decisions regarding a project's consistency with a general plan for an abuse of discretion. While there is disagreement in the courts of appeal over whether a finding of consistency is a quasi-legislative or quasi-judicial action, the standard of review under either is not materially different. (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 514 [reviewed by administrative mandamus]; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 [quasi-legislative act reviewed by ordinary mandamus under arbitrary and capricious standard].) The question for us "is whether the City's finding of consistency with the general plan was reasonable based on the evidence in the record." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 637; *Endangered Habitats League, Inc. v. County of Orange, supra*, 131 Cal.App.4th at p. 782, fn. 3.)

We give substantial deference to the City's determination that the project is consistent with the general plan. "[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity.' " (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 677-678, quoting *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.) "[A] determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, '. . . a reasonable person could not have reached the same conclusion.' (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 243.)" (*Families Unafraid to Uphold Rural etc. v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1338.)

6

B.  *Zoning uniformity*

Plaintiff asserts the City's reliance on LU 1.1.10 to approve the project violated a doctrine of zoning uniformity.  This doctrine, according to plaintiff, requires zoning ordinances to be uniform for each kind of building throughout a zoning district.  Zoning regulations must " 'be uniform and equal in operation and effect, and provide those in similar circumstances, among whom no reasonable basis for distinction exists, with equal protection of the law . . . .' "  (Quoting 8 McQuillin, Mun. Corp. (3d ed.) § 25.65, fns. omitted.)

Government Code section 65852 requires zoning uniformity in general law cities.  That statute requires zoning ordinances to be "uniform for each class or kind of building or use of land throughout each zone."  (Gov. Code, § 65852.)  But as plaintiff acknowledges, the City is a charter city, and Government Code section 65852 does not apply to charter cities.  (Gov. Code, § 65803.)

Lacking a statutory basis to impose zoning uniformity on the City, plaintiff argues this law of zoning uniformity is derived from the equal protection and due process clauses of the Fourteenth Amendment and the California Constitution and from a zoning "contract" implied in law between citizens and the government.  Under this contract, landowners forego the right to use their land as they wish in return for assurance that the use of neighboring property will be similarly restricted.  (See *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 517-518 (*Topanga*); *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1009.)

The guarantees of equal protection and due process do not mandate such a high standard of uniformity in zoning.  Neither the federal constitution nor the state constitution imposes a zoning uniformity doctrine or zoning contract as plaintiff describes.  General plan policies and zoning ordinances must not violate rights of equal

7

protection and due process, but those rights do not bar the City's use of LU 1.1.10. in this instance. The City's approach may be novel, but it is not unconstitutional.

A California city derives its power to control land use from its inherent police power. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 782.) The police power is the right to enact and enforce laws to protect public health, safety, and welfare. (Cal. Const., art. XI, § 7.) The power includes the authority to enact comprehensive land use and zoning laws. (*Village of Euclid v. Ambler Realty Co.* (1926) 272 U.S. 365, 394-397 [71 L.Ed. 303].)

A city's authority to exercise police power in land use matters is broad. "We begin with the well-established principle that under the California Constitution a municipality has broad authority, under its general police power, to regulate the development and use of real property within its jurisdiction to promote the public welfare. . . . *As a general matter, so long as a land use restriction or regulation bears a reasonable relationship to the public welfare, the restriction or regulation is constitutionally permissible.*" (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 455, italics aded.) " 'In deciding whether a challenged [land use] ordinance reasonably relates to the public welfare, the courts recognize that such ordinances are presumed to be constitutional, and come before the court with every intendment in their favor.' " (*Ibid.*, quoting *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 604-605.)

A city's authority to regulate land use, although broad, is not unlimited. "A city's power to enact zoning regulation derives from the police power and, as such, zoning regulations must be reasonably necessary and reasonably related to the health, safety, morals, or general welfare of the community. (*In re White* (1925) 195 Cal. 516, 520.) To be valid, zoning regulations must be expressly or impliedly based upon a finding by the governing body of the municipality that such regulations are necessary for the general

8

welfare of the community." (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1012.)

Other limits on a city's land use authority exist. Even though the City is a charter city, when exercising its police power to regulate land use, it is subject to limits imposed by the federal and state constitutions, the terms of its charter, preempting federal and state legislation, and laws which the Legislature requires charter cities to obey. (U.S. Const., art. VI, § 2; Cal. Const., art. XI, § 5(a); Gov. Code, § 65700; *People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476, 484, 491.)

However, the police power "is not to be lightly limited." (*Miller v. Board of Public Works* (1925) 195 Cal. 477, 484.) It may expand to meet new conditions in society. " '[T]he police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life, and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race. In brief, "there is nothing known to the law that keeps more in step with human progress than does the exercise of this power." ' " (*Consolidated Rock Products Co. v. City of Los Angeles* (1962) 57 Cal.2d 515, 522, quoting *Miller v. Board of Public Works, supra*, 195 Cal. at p. 485.)

Asserting that zoning uniformity derives from the 14th Amendment, plaintiff argues the approval violated equal protection and due process guarantees. Regarding the former guarantee, plaintiff contends equal protection requires that restrictions on one parcel in a zone apply to all parcels in the zone and that each parcel in the zone have the same opportunity to develop as any other parcel in the zone. Plaintiff asserts the use of LU 1.1.10 to approve the project violated equal protection and was effectively an unlawful spot zoning without a zoning amendment.

9

The project approval and LU 1.1.10 do not violate the equal protection clause. Equal protection does not require zoning uniformity where, as here, the different treatment is rationally related to a legitimate governmental purpose.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike. . . . The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is *rationally related to a legitimate state interest*. . . . When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude [citations], and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." (*City of Cleburne v. Cleburne Living Center* (1985) 473 U.S. 432, 439-440 [87 L.Ed.2d 313], italics added.)[1]

The approval and LU 1.1.10 do not violate the equal protection clause because they are rationally related to a legitimate public interest. By adopting LU 1.1.10 and approving the project, the City exercised its police power to provide "high quality infill development" which the general plan and zoning code may not have otherwise allowed.

LU 1.1.10 was created as part of the City's 2009 effort to revise its general plan, resulting in the 2030 General Plan. Planning staff explained the policy's purpose to the city council as follows: "Staff has worked with the preservation and development communities to address the need to balance the preservation of existing neighborhoods and their historic resources with high quality infill development. This outreach resulted

---

[1] Legislative classifications based on race, alienage, national origin, gender and illegitimacy or that affect other fundamental interests are reviewed under higher standards of review (*City of Cleburne v. Cleburne Living Center, supra*, 473 U.S. at pp. 440-441), but plaintiff does not allege LU 1.1.10 or the project approval discriminate based on any suspect classification.

10

in the addition of . . . new policies to better define the parameters of infill development that would be acceptable to the community.  The new policies keep the density standard at a medium level, but allow a density bonus . . . .  [¶] . . . [¶]  Staff is recommending that the maximum Floor-Area-Ratio (FAR) in the Central Business District be increased to be consistent with recent project applications for high-rises and to allow for high quality development that may exceed maximum FAR.”  Staff recommended adopting LU 1.1.10 “[i]n order to allow projects to exceed the maximum FAR under certain circumstances”; specifically, when the City determines the new development “provides a significant community benefit.”

Applying LU 1.1.10 here, the planning staff stated to the city council that its evaluation of a project’s significant community benefit considered “the unique offerings of a development, the context of that development, and the cumulative value of the benefit.”  The staff identified numerous community benefits the Yamanee project would provide.  We quote the staff report at length:  “Staff has identified several community benefits that this project offers, including a high level of design, home ownership opportunities, sustainable construction, abundant private and publicly accessible open space, pedestrian connectivity, alley activation, infill with vertical density, and pedestrian connectivity.

“The design features that this project offers far exceed the City’s minimum standards for design by providing architecture that achieves quality design, including a high degree of transparency on both J and 25th Streets that promote pedestrian engagement.  This transparency is contrasted against highly finish [*sic*], quality wood veneer panels and a vertical vegetation on the exterior of the building that offers an interesting feature that softens the building planes while offering visual variety.

“The abundant open space proposed, both private and publicly accessible, emphasizes the indoor/outdoor living that is embraced in Sacramento, and the project’s

11

design includes a pedestrian passage on the east side of the building and alley-facing uses that will emphasize alley activation while improving the public's safety and experience.

"Overall, this proposed project would create an active and engaging prominent corner that showcases the possibilities of signature Sacramento architecture."

Staff noted other community benefits the project would provide. It would help achieve the City's housing goal of building 10,000 new residential units in the central city by 2025. The project would reduce dependency on personal vehicles and cut carbon emissions. It advances City and regional goals of developing at higher densities than traditionally seen in Sacramento. The project would also "set a precedent for environmentally responsible development through the choice of materials and green design."

Based on these factors, staff recommended the City approve the project under LU 1.1.10: "General Plan Policy LU 1.1.10 was specifically intended to allow the City to take advantage of unique opportunities such as the Yamanee proposal. This mixed-use project has strong design and sustainability features that are consistent with numerous City goals and policies and the project site is an appropriate location for the additional height and density, which results in a significant community benefit."

The city council accepted staff's recommendations and made similar findings of fact to justify approving the project under LU 1.1.10. As the record attests, LU 1.1.10 and the project approval under LU 1.1.10 were rationally related to the city's legitimate goal of obtaining quality infill development that provided significant community benefit. The equal protection clause was satisfied.

Plaintiff contends that allowing the project to exceed the floor-area ratio under LU 1.1.10 acts as an unlawful spot zoning. It does not. " 'Spot zoning occurs where a small parcel is restricted and given lesser rights than the surrounding property, as where a lot in the center of a business or commercial district is limited to uses for residential purposes thereby creating an "island" in the middle of a larger area devoted to other uses.

12

[Citation.]  Usually spot zoning involves a small parcel of land, the larger the property the more difficult it is to sustain an allegation of spot zoning.  [Citations.]  Likewise, where the "spot" is not an island but is connected on some sides to a like zone the allegation of spot zoning is more difficult to establish since lines must be drawn at some point.  [Citation.]  Even where a small island is created in the midst of less restrictive zoning, the zoning may be upheld where rational reason in the public benefit exists for such a classification.'  (*Viso v. State of California* (1979) 92 Cal.App.3d 15, 22.)"  (*Arcadia Development Co. v. City of Morgan Hill* (2011) 197 Cal.App.4th 1526, 1536.)

This is not a spot zoning case, as the property has not been given lesser development rights than its neighboring parcels.  Plaintiff asserts the neighboring parcels have been given lesser development rights by the City approving the project under LU 1.1.10, but there is no evidence in the record that any neighboring owner sought and was denied authority to develop its land at a greater intensity or that the City would not review such an application under LU 1.1.10 for arbitrary or irrational reasons.  LU 1.1.10 does not apply only to real party's parcel of land.

Even if the City's approval was somehow seen as spot zoning, it would be subject to the same rational basis test that applies in equal protection analyses.  Spot zoning may be invalidated where the limitation is "unreasonable, oppressive and unwarranted."  (*Hamer v. Town of Ross* (1963) 59 Cal.2d 776, 781.)  This is not that case.

In addition to alleging a violation of equal protection guarantees, plaintiff claims LU 1.1.10 violates the Fourteenth Amendment because its standard of "significant community benefit" is too vague in violation of the due process clause.  Plaintiff asserts the policy's standard vests unbridled discretion in the City, as the general plan does not state how to determine whether a project meets the standard and the City has never implemented the standard in its zoning code.  In effect, there is no standard by which the City can justify approving a project under LU 1.1.10.  Plaintiff contends the City uses the policy ad hoc with no limits.

13

The phrase "significant community benefit" is not unconstitutionally vague. "[D]ue process rights are not violated because zoning and licensing ordinances . . . state somewhat imprecise guidelines for issuing a permit or license or vest a large degree of discretion in the issuing agency. ' "California courts permit vague standards because they are sensitive to the need of government in large urban areas to delegate broad discretionary power to administrative bodies if the community's zoning business is to be done without paralyzing the legislative process." ' (*People v. Gates* (1974) 41 Cal.App.3d 590, 595; and see *Novi v. City of Pacifica* (1985) 169 Cal.App.3d 678, 682; *Groch v. City of Berkeley* (1981) 118 Cal.App.3d 518, 522.) '[I]n California, the most general zoning standards usually are deemed sufficient. "The standard is sufficient if the administrative body is required to make its decision in accord with the general health, safety, and welfare standard." (Cal. Zoning Practice Cont. Ed. Bar [1969] p. 147.)' (41 Cal.App.3d at p. 595.)" (*Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1128-1129.) "[L]and use ordinances precluding uses detrimental to the ' "general welfare" ' are not unconstitutionally vague." (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 473.)

The phrase "significant community benefit" in LU 1.1.10 is no less vague than "general welfare." In fact, it may be more descriptive than "general welfare," as it requires not just a community benefit, but a significant community benefit to trigger the possible use of LU 1.1.10. The standard does not render LU 1.1.10 unconstitutionally vague.

Plaintiff's assertion of a constitutionally derived doctrine of zoning uniformity cannot stand when the constitutional provisions on which the doctrine is purportedly based do not require uniformity. Even the municipal law treatise cited by plaintiff as authority for the uniformity doctrine recognizes the limited scope of equal protection and due process rights in matters of zoning. The treatise states: "Zoning ordinances must be uniform and equal in operation and effect, and provide those in similar circumstances,

*among whom no reasonable basis for distinction exists*, with equal protection of the law, as is constitutionally required of all ordinances." (8 McQuillin, Mun. Corp., *supra*, § 25.65, italics added, fns. omitted.)

A doctrine of zoning uniformity also cannot be derived from a social contract. Plaintiff's argument for a zoning contract is based on language found in *Topanga, supra*, 11 Cal.3d at pages 517-518. In that case, the California Supreme Court held that a local agency that grants a zoning variance under state law applicable to general law cities must render factual findings to support its decision. (*Id*. at p. 510.) The court also held that a reviewing court must determine whether substantial evidence supports the agency's findings and whether the findings support the agency's decision. (*Ibid*.)

The *Topanga* court stated that requiring factual findings promoted meaningful judicial review of an agency's quasi-judicial action to grant a variance. It is in this context that the court referenced a contract. The court wrote: "By setting forth a reasonable requirement for findings and clarifying the standard of judicial review, we believe we promote the achievement of the intended scheme of land use control. Vigorous and meaningful judicial review facilitates, among other factors, the intended division of decision-making labor. Whereas the adoption of zoning regulations is a legislative function (Gov. Code, § 65850), the granting of variances is a quasi-judicial, administrative one. [Citations.] If the judiciary were to review grants of variances superficially, administrative boards could subvert this intended decision-making structure. [Citation.] They could '[amend] . . . the zoning code in the guise of a variance' (*Cow Hollow Improvement Club v. Board of Permit Appeals* [(1966) 245 Cal.App.2d 160,] 181), and render meaningless, applicable state and local legislation prescribing variance requirements.

"Moreover," the high court continued, "courts must meaningfully review grants of variances in order to protect the interests of those who hold rights in property nearby the parcel for which a variance is sought. A zoning scheme, after all, is similar in some

15

respects to a contract; each party foregoes rights to use its land as it wishes in return for the assurance that the use of neighboring property will be similarly restricted, the rationale being that such mutual restriction can enhance total community welfare. (See, e.g., 1 Appendix to Sen. J. (1970 Reg. Sess.) Final Rep. of the Joint Committee on Open Space Land (1970) p. 91; Bowden, Article XXVIII—Opening the Door to Open Space Control (1970) 1 Pacific L.J. 461, 501.) If the interest of these parties in preventing unjustified variance awards for neighboring land is not sufficiently protected, the consequence will be subversion of the critical reciprocity upon which zoning regulation rests. [¶] Abdication by the judiciary of its responsibility to examine variance board decision-making when called upon to do so could very well lead to such subversion." (*Topanga, supra*, 11 Cal.3d at pp. 517-518, fn. omitted.)

*Topanga's* analogy of zoning to a contract—and it was only an analogy—does not establish a constitutional or common law doctrine of zoning uniformity. Even the court realized the analogy worked only "in some respects." There is no doubt "the purpose of comprehensive zoning is the attainment of unity in the construction and development of a city, along lines of reasonable regulations which tend to promote the health, safety, morals, and general welfare of the community[.]" (*Miller v. Board of Public Works, supra*, 195 Cal. at p. 495.) Just as contractual covenants may restrict or obligate what actions the contracting parties may take for their mutual benefit, zoning regulations may restrict what a landowner may do with his or her property for the community's general welfare.

But, obviously, there is a difference between contractual rights and constitutional power. No California court has held that a charter city, merely by enacting a zoning ordinance, agrees to impose stricter limits on the exercise of its police power over land use than those imposed by the equal protection and due process clauses. Zoning may be based on theories of mutual benefit and reciprocity, but there is no constitutional doctrine or common law social contract in California that compels zoning legislation and land use

16

permits to meet a standard higher than the rationality and reasonableness required by the Fourteenth Amendment. Plaintiff's reliance on out-of-state authorities does not compel a different conclusion.

Indeed, the holding of *Topanga* rests on the constitutional imperative that local agencies acting in a quasi-judicial capacity act reasonably, rationally, and in compliance with governing statutes. Administrative findings allow a court to protect a neighbor's interest in enforcing the zoning ordinance. But a reviewing court will still look to see only that the local agency did not abuse its discretion and that its decision is supported by substantial evidence. (*Topanga, supra*, 11 Cal.3d at pp. 514-515.) In a challenge to the ordinance itself, the reviewing court will look to see only that the ordinance "bears a reasonable relation to the general welfare." (*Associated Home Builders etc., Inc. v. City of Livermore, supra*, 18 Cal.3d at p. 601.) Nothing in *Topanga* establishes a doctrine of zoning uniformity that would require courts to look for more uniformity than that required by the equal protection and due process clauses.

Plaintiff argues that *Neighbors in Support of Appropriate Land Use v. County of Tuolumne, supra*, 157 Cal.App.4th at page 1009, is relevant because it applied *Topanga's* zoning contract to require zoning uniformity when an agency approves a conditional use permit. That case, however, was decided under the Planning and Zoning Law's statute requiring zoning uniformity, Government Code section 65852, and that statute does not apply to charter cities like the City. (Gov. Code, § 65803.)

Uniformity may be "a fundamental rule in zoning" (*Redwood City Co. of Jehovah's Witnesses, Inc. v. City of Menlo Park* (1959) 167 Cal.App.2d 686, 697), but that does not make it a constitutional rule to the extent plaintiff argues. The uniformity requirement "is not a constitutional limitation . . . ." (4 Manaster & Selmi, California Environmental Law and Land Use Practice (2018 ed.) § 60.70, p. 60-114.3.) The City's approval of the project did not violate the Fourteenth Amendment or a nonexistent zoning contract.

C. *Delegation of legislative authority*

Plaintiff contends the City's approval of the project under LU 1.1.10 resulted from an unconstitutional delegation of legislative authority. It argues the City's approach in approving the project was an unconstitutional delegation in two ways. First, the significant community benefit standard in LU 1.1.10 does not "clarify the fundamental policy issue of how City staff are to balance the positive and negative effects of a project exceeding zoning standards on the local community vis a vis effects on [the] City . . . ." Second, LU 1.1.10 contains no objective standards "to constrain the discretion of City staff called on to determine whether a development project confers 'significant benefits' on the community . . . ."

LU 1.1.10 is not an unconstitutional delegation of legislative authority. "An unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy." (*Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 190.)

LU 1.1.10 has neither of these faults. First, planning staff did not decide a fundamental policy issue. The city council decided the fundamental policy issue when it adopted LU 1.1.10 as part of the general plan. That policy was to authorize quality infill development that would provide a significant community benefit when the zoning code might otherwise prohibit it. The planning staff did not establish this policy.

Second, LU 1.1.10 provides enough direction to implement that policy. "[A] general welfare standard is a sufficient guideline to enable an agency to act constitutionally." (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 510.) "We cannot conclude that merely because there are no expressed 'metes and bounds' delineating what is or what is not compatible, the ordinance is rendered infirm. While the legislative body cannot delegate its power to make a law, it can delegate a power to determine some fact

18

or state of things which the law is designed to address.  (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 376.)"  (*Rodriguez v. Solis, supra*, 1 Cal.App.4th at p. 510.)  LU 1.1.10 and the approval of the project were not the result of an unlawful delegation of legislative authority.

D.       *Procedural errors*

Plaintiff contends the City committed various procedural errors when it approved the project.  The City allegedly made no findings regarding the "significant community benefit" standard and the deviation from zoning, and it did not identify the deviations as "entitlements" or provide this information in its notices and final resolution.

The real party has filed a motion to strike this portion of plaintiff's argument, contending plaintiff did not raise these issues either in hearings before the City or in the trial court.  Plaintiff admits in opposing the motion to strike that it did not identify or raise these issues in the trial court.  It nonetheless contends we may review them because they are questions of law based on undisputed factual evidence.  The City, however, disputes the assertions made by plaintiff, arguing that it did not make the alleged errors.

Plaintiff has forfeited the issues.  " 'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried.  This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal. . . . '  (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2015) ¶ 8:229; p. 8-167.)  . . . ' "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. . . .  Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." '  (*Brandwein*

*v. Butler* (2013) 218 Cal.App.4th 1485, 1519.)" (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.)

This is especially true where, as here, the new issues raise questions of fact. The exception to the forfeiture rule for issues of law raised for the first time on appeal does not apply to unresolved factual issues. (*Araiza v. Younkin* (2010) 188 Cal.App.4th 1120, 1127.) By failing to raise the issues below, plaintiff has forfeited them here. Because plaintiff has forfeited the issues, we dismiss real party's motion to strike as moot.

## II

### *CEQA Contentions*

Plaintiff contends the City's approval of the project violated CEQA in two respects: (1) the City could not rely on a regional transportation and emissions reduction plan to justify reviewing the project in an SCEA because the plan was inadequate for that purpose; and (2) the SCEA improperly tiered to prior environmental impact reports to avoid analyzing the project's cumulative impacts. Again, we disagree.

### A. *Background*

The Sustainable Communities and Climate Protection Act, commonly known as SB 375, sought to integrate transportation and land use planning to reduce greenhouse gas emissions. (Stats. 2008, ch. 728, § 1; Stats. 2009, ch. 354, § 5.) SB 375 directed the state Air Resources Board to develop regional emission reduction targets for automobiles and light trucks. (Gov. Code, § 65080, subd. (b)(2)(A).) In turn, federally-designated metropolitan planning organizations that prepare regional transportation plans must include in those plans a "sustainable communities strategy" to achieve the emission targets. (Gov. Code, § 65080, subd. (b)(2)(B).) The parties refer to this combined transportation plan and emissions strategy as a metropolitan transportation plan/sustainable communities strategy (MTP/SCS). (For ease of reference, we will refer to the MTP/SCS as the strategy in most instances.)

20

The strategy directs the location and intensity of future land use development on a regional scale to reduce greenhouse gas emissions from motor vehicles. It must "identify the general location of uses, residential densities, and building intensities within the region," identify areas within the region sufficient to house the region's future population, and "set forth a forecasted development pattern for the region, which, when integrated with the transportation network, and other transportation measures and policies, will reduce the greenhouse gas emissions from automobiles and light trucks to achieve, if there is a feasible way to do so, the greenhouse gas emission reduction targets approved by the [Air Resources Board]." (Gov. Code, § 65080, subd. (b)(2)(B).) "The reductions mandated by Senate Bill 375 may be achieved through a variety of means, including 'smart growth' planning to maximize building densities at locations served by public transit and to locate residences near needed services and shopping to reduce automobile dependency." (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 506.)

One type of development the Legislature determined can help reduce greenhouse gas emissions from motor vehicles is a "transit priority project." A transit priority project is a development project that contains at least 50 percent residential use, provides a minimum density of at least 20 units per acre, and is located within one-half mile of a major transit stop or transit corridor. (Pub. Resources Code, § 21155, subd. (b).)

To encourage the development of transit priority projects, the Legislature in SB 375 limited the extent of environmental review that a local agency must perform under CEQA to approve them. If a transit priority project (1) "is consistent with the general use designation, density, building intensity, and applicable policies specified for the project area" in the strategy; and (2) incorporates all feasible mitigation measures, performance standards, and criteria set forth "in the prior applicable environmental impact reports" and which were adopted as findings, then the local agency may review the project's

21

environmental effects in a streamlined manner using an SCEA. (Pub. Resources Code, §§ 21155, subd. (a), 21155.2, subds. (a), (b).)

The review is streamlined because an SCEA is not required to analyze certain types of environmental impacts. It is not required to discuss growth inducing impacts or any project-specific or cumulative impacts on global warming or the regional transportation network that may arise from automobile and light-duty truck trips generated by the project. (Pub. Resources Code, § 21159.28, subd. (a).) Also, where the lead agency determines that a cumulative effect has been adequately addressed and mitigated in prior applicable certified environmental impact reports, that cumulative effect shall not be treated as cumulatively considerable and subject to further environmental review. (Pub. Resources Code, § 21155.2, subd. (b)(1).) In addition, the SCEA is not required to analyze off-site alternatives, nor is it required to reference, describe, or discuss a reduced residential density alternative to address the effects of car and light-duty truck trips generated by the project. (Pub. Resources Code, §§ 21155.2, subd. (c)(2); 21159.28, subd. (b).)

The Sacramento Area Council of Governments (SACOG) is the designated metropolitan planning organization for the Sacramento region. It adopted the region's first MTP/SCS in 2012. It reviewed the strategy's environmental effects in an environmental impact report. The Air Resources Board accepted the strategy that year, finding that if it was implemented, the region would meet the Air Resources Board's emission targets.

In its amicus brief, SACOG explains how it developed the strategy and how it and member cities may determine whether a proposed project is consistent with its emission reduction policies: "In crafting the MTP/SCS, SACOG first developed a growth forecast for the region and a projection for where that growth would occur in each of the region's 28 member jurisdictions within the timeframe of the plan. SACOG then identified and mapped the existing transit network and high-frequency transit lines in the region, as well

22

as major areas of employment.  (AR 0008315 and 008365 [MTP/SCS Executive Summary p. ii - xxv and Figure 3.9].)  Utilizing that as the base, SACOG then created five community types:  Center and Corridor Communities, Established Communities, Developing Communities, Rural Residential Communities, and Lands Not Identified For Development in the MTP/SCS Planning Period.  (AR 008353-8358 [MTP/SCS p. 32].)  Each community type was assigned an array of land uses, generally with the least intensive uses occurring in the rural areas not identified for urban development, gradually increasing to the most intensive land uses in the Center and Corridor Communities.  (*Id*.)  [*sic*]  The more intensive land uses were assigned to those geographic areas with the most reliable transit options because transit is most efficient where there are higher densities, while those areas without transit were identified for less intensive land uses.  (AR 008367-8370 [MTP/SCS Ch. 3, pp. 46-49].)  Using the growth projections, and taking into consideration reasonably foreseeable patterns of growth, SACOG then assigned a specific number of new housing units and jobs to each land use type within all 28 member jurisdictions.  These land use allocations, when viewed in tandem with the plan's community type map, identify the appropriate densities and intensities of development, consistent with the SCS requirements.  (*See* Real Party in Interest's Request for Judicial Notice in Support of Response Brief, Exhibit 2 [MTP/SCS Appendix E-3].)"  (Real party's and SACOG's requests for judicial notice are granted.)

The strategy locates the Yamanee project in the central city subarea of a Center and Corridor Community.  It states Center and Corridor Communities "are typically higher density and more mixed than surrounding land uses.  Centers and Corridors are identified in local plans as historic downtowns, main streets, commercial corridors, rail station areas, central business districts, town centers, or other high density destinations.  They typically have more compact development patterns, a greater mix of uses, and a wider variety of transportation infrastructure compared to the rest of the region."

23

The strategy forecast that by 2035, some urban centers and corridors would include "medium- and high-density housing and employment."  It foresaw significant demand for new housing "in mixed use communities close to public transit, employment, services and amenities."  Regarding the central city subarea in which the project will be built, the strategy states:  "Unlike anywhere else in the region, this area has capacity for and plans to build new office, residential and mixed-use building that are likely to exceed three and four stories. . . .  Collectively this Center and Corridor Community has the potential capacity to add more than 54,000 new jobs and 27,000 new homes.  This would more than double the amount of existing housing units in the central city."

SACOG organized the strategy in such a way that its policies for reducing greenhouse gas emissions were embedded in the strategy's metrics and growth forecast assumptions.  Thus, projects that were consistent with the strategy's growth forecasts were automatically consistent with the strategy's emissions policies.

The City determined the Yamanee project qualified as a transit priority project and that it was consistent with the general land use designation, density, building intensity, and applicable policies specified for the project area in the strategy.  Accordingly, it used an SCEA to review the project under CEQA.  The SCEA explained that the project was consistent with the strategy's forecast of low to high density residential and mixed uses, and the project would not exceed the strategy's forecasts of new homes in the central city subarea when added to other entitled projects.  As a transit priority project, it would increase housing options near high quality transit, provide for increased ridership to support existing and new rail and bus services, and reduce vehicle miles traveled and greenhouse gas emissions.

The SCEA addressed the project's cumulative effects except where excused under SB 375.  In doing so, it incorporated the relevant cumulative impacts analysis contained in the environmental impacts reports that were prepared for the City's general plan and for the strategy.

When the City denied plaintiff's appeal, adopted the SCEA, and approved the project, it found the project was "consistent with the general use designations, density, building intensity, and applicable policies specified for the project area" in the strategy. The City also found that the project's cumulative effects were "adequately addressed and mitigated in prior applicable certified [EIRs and are not considered] cumulatively considerable" for the purposes of this SCEA.

Plaintiff contends the City violated CEQA by (1) relying on the strategy to justify use of an SCEA because the strategy is too vague for determining the project's consistency with land use policies and its environmental impacts; and (2) relying on the environmental impact reports prepared for the City's general plan and the strategy to avoid analyzing the project's cumulative effects.

B.      *Standard of review*

We review plaintiff's CEQA challenge under the administrative writ statute, Code of Civil Procedure section 1094.5. An action attacking a public agency's decision on the grounds of noncompliance with CEQA, where the agency made its decision following a hearing required by law at which the agency took evidence and exercised discretion in determining facts, is reviewed under Code of Civil Procedure section 1094.5. (Pub. Resources Code, § 21168.) Under that statute, we ask whether "there was any prejudicial abuse of discretion. Abuse of discretion is established if [the City] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) We review the City's decision to analyze and approve a transit priority project through an SCEA under the substantial evidence standard. (Pub. Resources Code, § 21155.2, subd. (b)(7).) We do not exercise our independent judgment on the evidence but only determine whether the agency's decision is supported by substantial evidence considering the whole record. (Pub. Resources Code, § 21168.)

25

Judicial review of procedural error and factual error differs significantly. " 'While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564), we accord greater deference to the agency's substantive factual conclusions.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512, quoting *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.) We presume the City's findings and actions are supported by substantial evidence. (*Bay Area Citizens v. Association of Bay Area Governments* (2016) 248 Cal.App.4th 966, 998.) Plaintiff bears the burden of showing the City's findings are not supported by substantial evidence. (*Ibid.*)

C.     *Reliance on the strategy*

Plaintiff claims the City erred by relying on the strategy to justify using an SCEA. Plaintiff argues that because the strategy lacks specific density and building intensity standards, it could not "properly be utilized" by the City to justify reviewing the project in an SCEA. (Pub. Resources Code, § 21155, subd. (a).) The City's conclusion that the project falls within the strategy's range of general uses, densities, and building intensities does not satisfy CEQA because the strategy's density and building standards are so vague, any development would be consistent with the strategy. Moreover, the strategy undermines the City's general plan because it conflates all of the city center subarea as "higher density" without considering the City's nuanced approach to increase building intensity and density the closer a development in the city center area is to downtown.

Plaintiff argues the strategy did not identify "residential densities and building intensities within the region" to the extent necessary to enable a project's significant effects to be mitigated, and thus it cannot form the basis for justifying streamlined CEQA review under SB 375. The City should be authorized to streamline review of the project

26

only if the project's actual density and intensity are consistent with a density or intensity analyzed in a "regional plan for Midtown." Plaintiff does not explain what such a plan is or would be.

Plaintiff misunderstands the strategy's role. The strategy does not regulate land use in the manner plaintiff argues. Indeed, a strategy may "not regulate land use." (Gov. Code, § 65080, subd. (b)(2)(K).) "[A] sustainable communities strategy does not regulate land use and is not subject to state approval other than as prescribed. Nothing in a sustainable communities strategy is to 'be interpreted as superseding the exercise of the land use authority of cities and counties within the region,' nor shall anything 'require a city's or county's land use policies and regulations, including its general plan, to be consistent with the regional transportation plan.' ([Gov. Code,] § 65080, subd. (b)(2)(K).)" (*Bay Area Citizens v. Association of Bay Area Governments, supra*, 248 Cal.App.4th at p. 982.)

The strategy's purpose is to establish a regional pattern of development, not a site-specific zoning ordinance. It is "a forecasted development pattern for the region" which, if implemented by SACOG's member governments, will reduce greenhouse gas emissions from automobiles and light trucks that would otherwise result from new development. (Gov. Code, § 65080, subd. (b)(2)(B).) In order to meet regional greenhouse gas emission reduction targets, the strategy is required to identify "the *general* location of uses, residential densities, and building intensities within the region," identify *areas within the region* sufficient to house the region's projected population, identify a transportation network to service that regional population, and using the best scientific information available and in light of state housing policies, forecast a development pattern that will reduce greenhouse gas emissions. (Gov. Code, § 65080, subd. (b)(2)(B, italics added.) In SACOG's case, the region it was forecasting consists of six counties—Sacramento, Placer, El Dorado, Yolo, Sutter, Yuba—and the 22 cities in

those counties (excluding the Tahoe Basin), encompassing nearly four million acres of land, or roughly 6,000 square miles.

Nothing in SB 375 required the strategy to establish building intensity standards any more specific than what it did. The strategy identified the general location of uses, residential densities, and building intensities in the region, and it forecast where and how future development of those uses could best achieve greenhouse gas emission reductions. It based its forecast in part on the planning assumptions of each SACOG member's local general plans. (Gov. Code, § 65080, subd. (b)(2)(B).) Its policies and recommendations were supported by review in an environmental impact report that confirmed emissions would be reduced under the plan's land use assumptions. The Air Resources Board accepted the strategy, determining it met the state-mandated greenhouse gas emission reduction target.

SB 375 authorized the City to review the project in an SCEA if the project was consistent with the strategy. There is no dispute that substantial evidence supports the City's determination that the project was consistent with the strategy. Plaintiff's concern that some type of environmental review may not occur by using an SCEA in this instance is a complaint to take to the Legislature. The Legislature provided the CEQA streamlining provisions in SB 375 to "encourage[] developers to submit applications and local governments to make land use decisions that will help the state achieve its climate goals . . . ., assist in the achievement of state and federal air quality standards, and increase petroleum conservation." (Stats. 2008, ch. 728, § 1.) If it chose to exempt certain types of development from full environmental review based on those rational bases, we are not at liberty to question their wisdom.

D.    *Cumulative impacts*

Plaintiff asserts the City erred by relying on the environmental impact reports prepared for the general plan and the strategy to avoid analyzing the project's cumulative

impacts. Plaintiff claims streamlined review here is inappropriate because no prior environmental analysis has ever considered the cumulative impacts of high-rise development in Midtown approved pursuant to general plan policy LU 1.1.10. We conclude the City did not err. CEQA authorized the City to rely on the prior reports as part of its streamlined review of the project.

CEQA required the City, before drafting its SCEA, to prepare an initial study. The initial study was to identify the project's significant or potentially significant impacts, including cumulative impacts, except for growth inducing impacts or any project specific or cumulative impacts from cars and light-duty truck trips generated by the project on global warming or the regional transportation network based on substantial evidence in light of the whole record. (Pub. Resources Code, §§ 21155.2, subd. (b)(1); 21159.28, subd. (a).) The initial study had to identify any cumulative effects that had been adequately addressed and mitigated in prior applicable environmental impact reports. If the City determined a cumulative effect was adequately addressed and mitigated, it did not need to analyze that effect further in the SCEA. (Pub. Resources Code, § 21155.2, subd. (b)(1).)

The City's initial study on the Yamanee project, which is included as part of the SCEA, complied with these requirements. It relied upon and incorporated analysis and mitigation measures contained in the general plan and strategy environmental impact reports to address the project's effects, including its cumulative effects, on biological resources, archeological resources, soil erosion, paleontological resources, water resources and water quality, and the effects the project could cause by its use of hazardous materials, its creation of noise and vibration, and its generation of greenhouse gas emissions. CEQA authorized the City to rely on these prior analyses.

Plaintiff worries the project may change the density and building intensity over time in Midtown. This concern goes to the project's growth-inducing impacts, which

29

CEQA did not require the SCEA to review. (Pub. Resources Code, § 21159.28, subd. (a).)

And contrary to plaintiff's assertion, the project's cumulative effects of building significantly more housing on this site than otherwise allowed in the zoning code were reviewed on a regional basis in the strategy's environmental impact report. That report considered the cumulative effects of building over 300,000 new housing units in SACOG's six-county area, including 27,000 new residential units in the central city, not just the 134 units this project would add. The City did not err by relying on cumulative impact analysis performed in the general plan and strategy environmental impact reports.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to the City and the real party. (Cal. Rules of Court, rule 8.278(a).)


       HULL       , Acting P. J.


We concur:


       BUTZ       , J.


       DUARTE     , J.

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SACRAMENTANS FOR FAIR PLANNING,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SACRAMENTO,<br><br>Defendant and Respondent;<br><br>2500 J OWNERS, LLC,<br><br>Real Party in Interest and Respondent. | C086182<br><br>(Super. Ct. No. 34201680002396CUWMGDS)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge. Affirmed.

Michael W. Graf for Plaintiff and Appellant.

Office of the City Attorney, Susana A. Wood and Brett Morgan Witter; Jarvis, Fay & Gibson, Rick W. Jarvis and Christine L. Crowl Attorneys for Defendant and Respondent.

Taylor & Wiley, John M. Taylor, James B. Wiley and Matthew Steven Keasling for Real Party in Interest and Respondent.

Sacramento Area Council of Governments, Kirk E. Trost for Amicus Curiae on behalf of Real Party in Interest.

THE COURT:

The opinion in the above-entitled matter filed on July 3, 2019, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:


_____
HULL, Acting P. J.


_____
BUTZ, J.


_____
DUARTE, J.

2